TIMOTHY PERLA (admitted *pro hac vice*)
timothy.perla@wilmerhale.com
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

JESSICA LEWIS (SBN 302467)
jessica.lewis@wilmerhale.com
WILMER CUTLER PICKERING
    HALE AND DORR LLP
One Front Street, Suite 3500
San Francisco, CA 94111
Telephone: (628) 235-1160
Facsimile: (628) 235-1001

*Attorneys for Defendant*
*Life Insurance Company of the Southwest*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Scott Hoffman, Barry Blisten, Deann Fallas, Gerry Oxx, Damon Stokes, Susan Strozewski, Sarah White, and Maria De Altonaga, individually and as representatives of the Class,<br><br>        Plaintiffs,<br><br>   vs.<br><br>Life Insurance Company of the Southwest,<br><br>      Defendant. | Case No. 5:23-cv-04068<br><br>**DEFENDANT'S MOTION TO DISMISS CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS**<br><br>Date: November 30, 2023<br>Time: 10:00 a.m.<br>Place: Courtroom 8, 4th Floor<br>Judge: The Honorable P. Casey Pitts |

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................1

II. STATEMENT OF FACTS ...................................................................................4

    A.  LICS and Its Products ................................................................................4

    B.  The Website ...............................................................................................5

        1.  The Preface ......................................................................................6

        2.  The Product Pages...........................................................................7

        3.  Discontinued Products ....................................................................8

    C.  The Plaintiffs' Purchases ...........................................................................9

    D.  Plaintiffs and the Website .......................................................................10

    E.  This Lawsuit.............................................................................................11

III. ARGUMENT ....................................................................................................11

    A.  The Complaint Fails to Establish Statutory Injury ................................12

    B.  The Complaint Fails to State an Unlawfulness Claim............................15

        1.  The Statute Does Not Apply to Discontinued Products...........................16

        2.  Crediting Parameters Are Not "Fees".......................................19

    C.  The Complaint Fails to State an Unfairness Claim.................................22

    D.  The Complaint Fails to Establish Entitlement to Relief Under the UCL.........................................................................................................23

IV. CONCLUSION..................................................................................................24

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)................................................................................11

*Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters,*
    459 U.S. 519 (1983)...........................................................................12, 19

*Chavez v. Allstate Northbrook Indem. Co.,*
    2023 WL 3773939 (S.D. Cal. Apr. 13, 2023)............................................11, 23

*Chong v. Nestlé Waters N. Am., Inc.,*
    2020 WL 7690175 (C.D. Cal. Nov. 30, 2020), *aff'd*, 2021 WL 4938128 (9th Cir. Oct.
    22, 2021) ...........................................................................................17

*Coffee v. Google, LLC,*
    2022 WL 94986 (N.D. Cal. Jan. 10, 2022)...........................................23, 24

*Dimas v. JPMorgan Chase Bank, N.A.,*
    2018 WL 809508 (N.D. Cal. Feb. 9, 2018) ...............................................15

*Doe v. Successfulmatch.com,*
    2014 WL 1494347 (N.D. Cal. Apr. 16, 2014) .............................................15

*Durell v. Sharp Healthcare,*
    183 Cal. App. 4th 1350 (2010) ..............................................................12

*Eidmann v. Walgreen Co.,*
    522 F. Supp. 3d 634 (N.D. Cal. 2021), *appeal dismissed*, 2021 WL
    4785889 (9th Cir. May 17, 2021) ...........................................................23

*Forsyth v. HP Inc.,*
    2020 WL 2524517 (N.D. Cal. May 18, 2020) ............................................19

*Goldsmith v. Allergan, Inc.,*
    2011 WL 2909313 (C.D. Cal. May 25, 2011) ............................................15

*Hammerling v. Google LLC,*
    615 F. Supp. 3d 1069 (N.D. Cal. 2022)....................................................22

*In re Actimmune Mktg. Litig.,*
    2010 WL 3463491 (N.D. Cal. Sept. 1, 2010), *aff'd*, 464 F. App'x 651 (9th
    Cir. 2011) .........................................................................................12

ii

*In re Facebook, Inc., Consumer Priv. User Profile Litig.*,
    402 F. Supp. 3d 767 (N.D. Cal. 2019) ...............................................................13

*In re Nexus 6P Prods. Liab. Litig.*,
    293 F. Supp. 3d 888 (N.D. Cal. 2018) ...............................................................24

*In re Tobacco II Cases*,
    46 Cal. 4th 298 (2009) ........................................................................................12

*In re Turner*,
    859 F.3d 1145 (9th Cir. 2017) ............................................................................15

*Iron Bridge Mortg. Fund, LLC v. Bank of Am., N.A.*,
    539 F. Supp. 3d 1030 (N.D. Cal. 2021) .............................................................19

*Johnson v. Trumpet Behavioral Health, LLC*,
    2022 WL 74163 (N.D. Cal. Jan. 7, 2022) ..........................................................23

*Kwikset Corp. v. Superior Court*,
    51 Cal. 4th 310 (2011) ..................................................................................13, 14

*Mai v. Supercell Oy*,
    2023 WL 25713 (N.D. Cal. Jan. 3, 2023) ....................................................22, 24

*Mason v. Machine Zone, Inc.*,
    140 F. Supp. 3d 457 (D. Md. 2015), *aff'd*, 851 F.3d 315 (4th Cir. 2017) ..........14

*Navarro v. Block*,
    250 F.3d 729 (9th Cir. 2001) ..............................................................................11

*Pacific Coast Fed'n of Fishermen's Ass'ns v. Glaser*,
    945 F.3d 1076 (9th Cir. 2019) ............................................................................21

*Peterson v. Cellco P'ship*,
    164 Cal. App. 4th 1583 (2008) ...........................................................................14

*Roffman v. Perfect Bar, LLC*,
    2022 WL 4021714 (N.D. Cal. Sept. 2, 2022) ...............................................14, 15

*Rojas-Lozano v. Google, Inc.*,
    159 F. Supp. 3d 1101 (N.D. Cal. 2016) .............................................................12

*Schertzer v. Bank of Am., N.A.*,
    445 F. Supp. 3d 1058 (S.D. Cal. 2020) ..............................................................17

*Sidhu v. Bayer Healthcare Pharm. Inc.*,
    2022 WL 17170159 (N.D. Cal. Nov. 22, 2022) .................................................23

iii

DEFENDANT'S MOTION TO DISMISS
*Hoffman, et al. v. Life Insurance Company of the Southwest*, No. 5:23-cv-04068

*SmileCare Dental Grp. v. Delta Dental Plan of California, Inc.*,
    88 F.3d 780 (9th Cir. 1996) .................................................................11

*Song fi Inc. v. Google, Inc.*,
    108 F. Supp. 3d 876 (N.D. Cal. 2015) ...............................................21

*Sonner v. Premier Nutrition Corp.*,
    971 F.3d 834 (9th Cir. 2020) .............................................................23

*Sousa v. Walmart, Inc.*,
    2023 WL 1785960 (E.D. Cal. Feb. 6, 2023).......................................24

*Swearingen v. Late July Snacks LLC*,
    2017 WL 4641896 (N.D. Cal. Oct. 16, 2017)....................................13

*Sybersound Recs., Inc. v. UAV Corp.*,
    517 F.3d 1137 (9th Cir. 2008) ...........................................................15

*Taylor v. Sam's W., Inc.*,
    2020 WL 12947974 (C.D. Cal. Oct. 7, 2020).....................................23

*Top Gun, Ltd. v. Vector-US, Inc.*,
    2017 WL 2687683 (Cal. Ct. App. June 22, 2017) ..............................14

*Van Patten v. Vertical Fitness Grp., LLC*,
    847 F.3d 1037 (9th Cir. 2017) ...........................................................13

*Williams v. Securitas Sec. Serv. USA, Inc.*,
    2023 WL 5310937 (N.D. Cal. Aug. 16, 2023) ...................................15

**Docketed Cases**

*Bartlett, et al.  v. North Am. Co. for Life & Health Ins.*,
    No. 5:23-cv-4123-NC (N.D. Cal.) ......................................................11

*Blanchard, et al. v. Americo Fin. Life & Annuity Ins. Co.*,
    No. 5:23-cv-4087-NC (N.D. Cal.) ......................................................11

*Jacobson, et al. v. Metropolitan Life Ins. Co.*,
    No. 23STCV14788 (Cal. Sup. Ct., Los Angeles Cnty.) .....................11

*Taylor, et al. v. Midland Nat'l Life Ins. Co.*,
    No. 5:23-cv-4125-NC (N.D. Cal.) ......................................................11

**Statutes and Rules**

26 U.S.C. § 403(b) .......................................................................................4

iv

Cal. Educ. Code
    §§ 25100-25115 ............................................................................... *passim*

Cal. Ins. Code
    § 10127.9 ........................................................................................9
    § 10509.6 ......................................................................................18
    § 10509.914 ....................................................................................9
    § 10509.915 ....................................................................................9

Cal. Bus. & Profs. Code
    § 17200 .......................................................................................1, 12
    § 17240 .........................................................................................12

Fed. R. Civ. P. 12(b)(6) ................................................................................1

**<u>Other Authorities</u>**

*Updated Investor Bulletin: Indexed Annuities*, SEC, https://www.sec.gov/oiea/investor-
    alerts-and-bulletins/ib_indexedannuities (Jul. 31, 2020). ..................................21

DEFENDANT'S MOTION TO DISMISS
*Hoffman, et al. v. Life Insurance Company of the Southwest*, No. 5:23-cv-04068

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on November 30, 2023 or as soon thereafter as the matter may be heard, in the Courtroom of The Honorable P. Casey Pitts, 280 South First Street, San Jose, CA, 95113, Defendant Life Insurance Company of the Southwest ("LICS") will and hereby does move to dismiss Plaintiffs' Class Action Complaint ("Complaint" [ECF No. 1-2]). Defendant moves pursuant to Federal Rule of Civil Procedure 12(b)(6) on the grounds that the Complaint fails to plead facts sufficient to state a claim against Defendant.  The motion is based on this Notice of Motion and Motion, the following Memorandum of Points and Authorities, the Request for Judicial Notice ("RJN") and Declaration of Jessica Lewis ("Lewis Declaration") filed and served concurrently, the pleadings and records in this action, the argument of counsel, and any other matters that may be presented to the Court.  All references to "Ex." herein refer to exhibits to the Lewis Declaration.

## ISSUES TO BE DECIDED

1.      Whether, pursuant to Federal Rule of Civil Procedure 12(b)(6), the Complaint states a claim for relief under California Business and Professions Code § 17200 (the "UCL").

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.      INTRODUCTION

In this putative class action, Plaintiffs allege that Defendant LICS is liable under the UCL for violating California Education Code Sections 25100-25115 (the "Statute").  The Statute requires "prospective vendors" of "offered" 403(b) retirement products in California to make certain disclosures on www.403bcompare.com (the "Website"), a website created by the Teachers' Retirement Board (the "Board").  Cal. Educ. Code § 25101.  Plaintiffs cite provisions of the Statute requiring the disclosure of "fees" under certain circumstances (*id.* §§ 25101, 25107) and assert that LICS's products include "fees" that are not adequately disclosed on the Website.

In advancing this theory, Plaintiffs focus on LICS's indexed annuities, which are a form of deferred annuity in which the amount of interest credited can depend on the performance of a market index (*e.g.*, the S&P 500).  A mathematical calculation set forth in the annuity contract is used to translate returns of the market index into annuity interest credit.  That calculation can involve parameters known as caps, spreads, and participation rates that can impact the amount of interest credited (the "Crediting Parameters").  The insurance company periodically declares the "current" rates of the Crediting Parameters for any new investment, which are the rates used in the calculation as of any given time.  The annuity contract also specifies "guaranteed" rates, which are the outer bounds of how the current rates can be set.[1]

To conjure an alleged violation of the Statute, Plaintiffs contend (incorrectly) that: (i) Crediting Parameters are "fees" within the meaning of the Statute; (ii) disclosing the guaranteed rates of Crediting Parameters on the Website (which Plaintiffs largely acknowledge occurred) is insufficient because any current rates must continually be updated; (iii) these purported "fees" (*i.e.*, current rates for Crediting Parameters) are "undisclosed," such that LICS may not "charge" them; and (iv) LICS violated the UCL by "charging" these "fees."  This attenuated theory is fatally flawed in numerous respects.

***First***, Plaintiffs have not alleged statutory injury, as required to assert a UCL claim following the passage by California voters of Proposition 64.  The Complaint is rife with hyperbole about "high" "fees" that allegedly are "undisclosed" on the Website, but Plaintiffs do not assert that they ever viewed the Website, much less that they were misinformed about any "fee" or Crediting Parameter.  Plaintiffs also never explain how they could possibly be harmed by alleged Website disclosures that described the least favorable rates for Crediting Parameters (*i.e.*, the guaranteed rates) when Plaintiffs if anything received *more favorable* rates (*i.e.*, the current rates).  And Plaintiffs do not deny that their annuity contracts (Exs. M-T) and quarterly

---

[1] For example, the "guaranteed" cap set forth in an annuity contract may be 1% interest, meaning the insurance company is not permitted to declare a lower cap.  But the "current" cap applicable at a given time may be a higher figure, such as 10%.

DEFENDANT'S MOTION TO DISMISS
*Hoffman, et al. v. Life Insurance Company of the Southwest*, No. 5:23-cv-04068

1   statements (Exs. U-V) disclosed all relevant information about their products.  Indeed, the

2   Complaint paradoxically seeks to establish the existence of "undisclosed" "fees" by *pointing to*

3   *disclosure of that information on quarterly statements.  E.g.*, Compl. ¶¶ 103, 105.  The

4   Complaint also does not deny that Plaintiffs as annuity purchasers received additional legal

5   protections, including a statutory "free look" period during which they could receive a full

6   refund, and a requirement that their insurance agent ensure the purchase is suitable.  In short,

7   Plaintiffs are not injured consumers.  Rather, they—through a law firm that recently filed a rash

8   of similar claims against insurers (*see infra* n.7)—seek a windfall untethered to injury.

9           ***Second***, the Complaint fails to state a UCL "unlawfulness" claim because the Statute

10  requires disclosures only by "prospective vendors" of "offered" products—terms the Statute uses

11  over and over.  *See, e.g.*, Cal. Educ. Code § 25101.  "Offered" products are those that

12  participants can still choose to purchase.  Compl. ¶¶ 77, 122.  However, Plaintiffs complain not

13  about products that are "offered" but rather about products they admit are "discontinued,"

14  meaning no longer available for purchase.  *Id.* ¶ 122.  The text of the Statute does not require

15  disclosure for discontinued products, nor would that be consistent with the Statute's purpose (to

16  provide information about products on offer).  Indeed, the Website (as designed by the Board)

17  *does not even allow* a participating company to edit or update the disclosures relating to a

18  discontinued product.  Thus, the continual updates of the Website that Plaintiffs demand (*see*

19  Compl. ¶ 68) are not required.

20          ***Third***, Crediting Parameters are not "fees" within the meaning of the Statute.  The

21  California legislature, rather than defining fees, charged the Board with doing so.  Cal. Educ.

22  Code § 25106(c).  The Board did so by including a Website Glossary.  The Glossary defines

23  "Caps, Spread, and Participation" not as fees, but rather as "moving parts" within the interest-

24  crediting math for indexed annuities.  *See* Ex. A.  The Glossary *separately* defines "Fees

25  (product)" in a manner that has nothing to do with the Crediting Parameters.  *See* Ex. B.  Were

26  that not enough, for each indexed annuity product, the Board created a webpage format with two

27  distinct tabs: "Product Details" and "Fees and Charges."  *See* Exs. D-K.  The Board placed

28

DEFENDANT'S MOTION TO DISMISS
*Hoffman, et al. v. Life Insurance Company of the Southwest*, No. 5:23-cv-04068

disclosure concerning Crediting Parameters under the "Product Details" tab (where it belongs), not the "Fees and Charges" tab. *See id.* Thus, the Crediting Parameters are not "fees" under the Statute. Instead, they are—as described by the Board—moving parts within the crediting math.

*Fourth*, Plaintiffs cannot salvage any part of the Complaint by relabeling their UCL "unlawfulness" claim as a UCL "unfairness" claim. The law is clear that where, as here, an unfairness claim has the same unsuccessful predicate as an unlawfulness claim, they fail together.

*Finally*, Plaintiffs have not alleged a basis for relief under the UCL. They do not plead that they lack a remedy at law, which is required. Nor do they explain how they would benefit from prospective injunctive relief, especially given that they hold discontinued products or no longer hold LICS products at all.

Thus, the Court should dismiss the Complaint. Further, since the defects alleged herein are not curable, dismissal should be with prejudice.

## II.   STATEMENT OF FACTS

### A.   LICS and Its Products

LICS issues life insurance and annuity products across the country. Compl. ¶¶ 12, 35. Relevant here, LICS (and numerous other insurers) offer annuities to eligible California public school employees pursuant to 26 U.S.C. § 403(b). *Id.* ¶¶ 3, 97.

An annuity is a contract between a policyholder and an insurance company. Compl. ¶ 55. Generally, the policyholder makes one or more premium payments and, subject to the contract terms, the insurer makes disbursements. *Id.* Annuities can accrue interest through various means, such as a fixed rate (*e.g.*, 4% annually) or by reference to the performance of a market index (*e.g.*, the S&P 500), the latter being referred to as "indexed annuities." *Id.* ¶ 57.[2]

---

[2] Variable annuities (not at issue here) are yet another type of annuity. Variable annuities provide exposure to investments in underlying securities, meaning that the purchaser takes full market risk, both upside and downside. Indexed annuities, in contrast, generally have a floor of zero (*i.e.*, no negative returns) and as a tradeoff can limit positive returns.

DEFENDANT'S MOTION TO DISMISS
*Hoffman, et al. v. Life Insurance Company of the Southwest*, No. 5:23-cv-04068

Indexed annuity contracts set forth crediting strategies that specify how the performance of a market index contractually translates into credited annuity interest. Compl. ¶¶ 79-84. For instance, a "point to point" crediting strategy compares the value of the specified market index on the first day of a crediting period with the value of the market index on the last day of the crediting period as a basis on which to calculate annuity interest subject to the contract terms. *Id.* ¶ 81. A contract can allow a policyholder to choose among various crediting strategies. *Id.* ¶ 79.

Crediting strategies can incorporate various contractual parameters that specify how the market return translates into annuity interest (as referred to herein, Crediting Parameters). Compl. ¶¶ 89-92. Examples of Crediting Parameters include the following:

- **Caps**. A cap is the maximum market index return that translates into annuity interest. Compl. ¶ 89. For example, if the market index returns 10% over a crediting period but the cap is 9%, then (ignoring any other Crediting Parameters) the annuity interest credit would be 9%. Annuity contracts specify the "guaranteed" cap for each crediting strategy (*i.e.,* least favorable for the policyholder) that could apply. *Id.* ¶ 103. The insurance company, however, periodically declares a "current" cap, which is either the same as, or higher than (and thus more favorable to the policyholder), the "guaranteed" cap. *See id.*

- **Participation Rates.** A participation rate is a multiplier that determines how much of the index return translates into annuity interest. Compl. ¶ 90. For example, if the participation rate is 100%, and the index return is 8%, then (ignoring any other Crediting Parameters) the annuity interest credited will be 8%. *See id.* If the participation rate is less than 100%, then the annuity interest percentage will be lower than the index return percentage, and vice versa. *See id.* Annuity contracts specify "guaranteed" participation rates for each crediting strategy. *Id.* The insurance company, however, periodically declares a "current" rate, which is either the same as, or higher than (and thus more favorable to the policyholder), the "guaranteed" participation rate. *See id.* ¶ 105.

- **Spreads.** While generally not applicable to the LICS products at issue,[3] crediting strategies can also be subject to spreads. A spread is a percentage that is subtracted from the index return before crediting annuity interest. Compl. ¶ 91. The annuity contract specifies the "guaranteed" spread (*i.e.*, least favorable for the policyholder), and the insurance company periodically can declare a lower, more favorable, "current" spread.

### B.   The Website

Apart from the extensive information provided by the insurance company to the policyholder (discussed below), there exists an online repository of certain information about

---

[3] Only one Plaintiff alleges that his LICS annuity involved a spread. Compl. ¶ 91.

403(b) retirement products offered in California: www.403bcompare.com (*i.e.*, the Website). California Education Code §§ 25100-25115 (*i.e.*, the Statute) required the Teachers' Retirement Board to establish a registration process for "prospective vendors" of 403(b) products in California, and to establish an "investment information bank" about offered 403(b) retirement products.  Cal. Educ. Code § 25100.  The Website is the information bank.  Compl. ¶ 64.  The Statute requires the Website to have components including: (i) a "Preface" (§ 25106(c)) and (ii) Product Pages containing information about offered 403(b) retirement products (§ 25104(a)).

### 1.    The Preface

The Website is statutorily required to include a "preface" that contains (among other things), "[d]efinitions or explanations of all fees referred to in the investment information bank." Cal. Educ. Code § 25106(c).  The Website thus contains a "Help & Resources" section that contains a "Glossary" of definitions.  *See Help & Resources*, 403bCompare, https://www.403bcompare.com/HelpAndResources.

The Glossary defines numerous terms relating to annuities, mutual funds, and financial concepts.  *See Glossary*, 403bCompare, https://www.403bcompare.com/Glossary.  As relevant here, the Glossary defines "Caps, Spread, and Participation":

> Almost all indexed annuities have internal moving parts referred to as spreads, caps, and participation rates. The fluctuations of these moving parts can significantly affect your annuity's rate of return now and in the future. Vendors will adjust their caps, spreads and participation rates each year and in doing so will either increase or decrease your potential rate of return.

Ex. A.  The Glossary also defines "Fee (products)" by stating, "[p]roduct fees are fees, charges, and expenses associated with the opening of and contributing to a 403(b) account."   Ex. B.  The Glossary also defines numerous other kinds of fees, but never refers to caps, spreads, or participation rates as fees.  *See generally* Exs. A-B.

Finally, the Website also links from the "Help & Resources" page (cited at Compl. ¶ 84) to a page titled "403(b) & 457(b) Fundamentals."  *See* Ex. C (https://www.403bcompare.com/

Fundamentals403bAnd457b).  It has a subsection titled "Product Fees (Vendor Fees)" that contains an exemplar list of fees.  *See id.*  Nothing in the list of fees refers to caps, spreads, or participation rates.  *See id.*

## 2.    The Product Pages

The Website also hosts a product information bank that "contain[s] the information required by Section 25101 about the retirement investment products offered by each registered vendor…."  Cal. Educ. Code § 25104(a).  To populate the information bank, Section 25101 requires each "prospective vendor of 403(b) products" to register the "products that it offers" with the Board.  *Id.* § 25101(a).  In connection with such registration, prospective vendors must disclose eleven categories of information about offered products.  *Id.* § 25101(a)(1)-(11).  Item (3) requires:

> A disclosure of all expenses paid directly or indirectly by retirement plan participants, including, but not limited to, penalties for early withdrawals, declining or fixed withdrawal charges, surrender or deposit charges, management fees, and annual fees, supported by documentation as required for prospectus disclosure by the Financial Industry Regulatory Authority and the Securities and Exchange Commission.

*Id.* § 25101(a)(3).  The Statute provides that "[a] vendor may not charge a fee associated with a registered 403(b) product that is not disclosed, pursuant to Section 25101."  *Id.* § 25107.[4]

Prospective vendors cannot choose the form for their disclosures on the Website.  Rather, the Statute requires that "[v]endors shall supply information and data in the format *required by the board*."  *Id.* § 25101(c) (emphasis supplied).  The format chosen by the Board for the Website is a single webpage for each offered 403(b) retirement product (referred to herein as the "Product Pages").  Complaint footnotes 18-27 cite links to Product Pages appearing on the Website.  *See also* Exs. D-K.

---

[4] Portions of the Statute refer to requirements imposed by the Securities and Exchange Commission (SEC) or the Financial Institution Regulatory Authority (FINRA).  *See, e.g.*, Cal. Educ. Code § 25101(a)(3).  These provisions are not relevant to this case because indexed annuities are not securities and thus are not regulated by the SEC or FINRA.

The Product Page format (specified by the Board) is uniform for all products. *Compare* Exs. D-K. Each Product Page has two tabs: "Product Details" and "Fees and Charges." *See id*. Information about "Caps, Spread, and Participation" appears under the "Product Details" tab, *not* the "Fees and Charges" tab. *See id*. Thus, the Board, through its statutory mandate to set the form of disclosure on the Product Pages and to define all fees, recognized caps, spread, and participation rates for what they are—product features—and intentionally chose not to characterize them as fees.

Finally, the Statute also empowers (though does not require) the Board to require vendors upon renewal of their registration to update information for offered products:

> The board *may* require, through a password-based update system that allows vendors to access the registration list for the purposes of updating their product information, or through other means, an update of the information required to be provided under Section 25101 with each registration renewal. Registered vendors shall submit to the board within the time required by the Securities and Exchange Commission an amendment to the information required to be provided under Section 25101 to reflect material changes to the products or services offered that occur between registration or renewal periods. Registered vendors may register additional 403(b) products with the board between registration or renewal periods by providing the board the information required under Section 25101 and fees required under subdivision (c) of Section 25108.

Cal. Educ. Code § 25102 (emphasis supplied). The Complaint does not allege that the Board ever implemented a requirement for vendors to update information concerning offered products.

### 3. Discontinued Products

Vendors can discontinue offering 403(b) retirement products, in which case they are designated "Discontinued" on the Website. Compl. ¶ 77 (alleging that the Website "allows vendors to designate a product as 'Discontinued,' meaning that it is no longer offered to new investors"). The Website does *not* permit updates of the Product Pages for discontinued products. This can be seen in Exhibit L to the Lewis Declaration, which is the vendor view of the Product Pages for LICS, as described in the Complaint (¶ 71). For discontinued products, the pencil icon that allows editing is greyed out and disabled. *See* Ex. L.

C.     The Plaintiffs' Purchases

Plaintiffs allege they are eight California residents who purchased six different types of indexed annuity products issued by LICS: FIT Income Plus (Blisten), FIT Rewards Growth (Hoffman), SecurePlus Elite (Oxx), SecurePlus Paramount 5 (De Altonaga, Fallas), SecurePlus Platinum (Stokes, White), and SecurePlus Silver (Strozewski).  Compl. ¶¶ 17-33.  With one exception for which they lack knowledge, Plaintiffs plead that their LICS products are discontinued, meaning they are no longer offered.  *Id.* ¶ 122.

The purchase process for annuities (including LICS annuities) is highly regulated.  For instance, insurance agents are statutorily required to ensure that annuities they recommend to purchasers are suitable for them.  Cal. Ins. Code § 10509.914.  Insurance agents must complete training and be knowledgeable about products.  *Id.* § 10509.915.  Further, every California annuity sale involves a "free look" period whereby a purchaser is accorded at least ten days to review the annuity contract with an unconditional right to return it and receive a refund of all premiums.  *Id.* § 10127.9.  Copies of Plaintiffs' contracts are Exhibits M-T to the Lewis Declaration.  The contracts disclose the free look period, as well as all terms of the annuities, including without limitation:

- How each crediting strategy is calculated.  *E.g.*, Ex. M (at 14 of 36 - 20 of 36).
- Whether each crediting strategy involves caps, spreads, and/or participation rates.  *E.g.*, *id.*
- The guaranteed rates of any applicable caps, spreads, and participation rates that can be applied to each available crediting strategy.  *E.g.*, *id.*
- The current rates of any applicable caps, spreads, and participation rates that apply to each available crediting strategy as of issuance.  *E.g.*, *id.*
- Any applicable withdrawal charge.  *E.g.*, *id.* (at 3 of 36, 8 of 36).

After purchase, Plaintiffs received quarterly account statements.  Examples (referred to in Compl. ¶¶ 103, 105) are Exhibits U and V to the Lewis Declaration.  *See also* Ex. W.  The quarterly statements provide extensive information, including the account value, amounts

credited, the surrender value, and any withdrawals.  *See, e.g.*, Ex. U (at 4 of 6 - 6 of 6).
Quarterly statements also disclose the current rates for Crediting Parameters (if any), including
the current caps, spreads, and participation rates applicable to each crediting strategy.  *Id.* (6 of
6).

### D.    Plaintiffs and the Website

Plaintiffs do not allege they have ever visited the Website or relied on the Website for
any information about their annuity products, either at the time of purchase or anytime thereafter.
*See generally* Compl.  Nor do Plaintiffs allege they made any investment decisions based on any
information disclosed (or undisclosed) on the Website.  Plaintiffs do not allege they purchased or
held onto any of their LICS products due to any representations made on the Website (or
otherwise) by LICS.  Nor do Plaintiffs allege they would have changed any of their behavior
based on any information provided (or not provided) on the Website.

Plaintiffs do not allege they were unaware, at any point in time, of any of the Crediting
Parameters applicable to their LICS products.  Plaintiffs do not allege they "discovered" or were
ever "surprised" to learn that the return on their products was impacted by any caps, spreads, or
participation rates.[5]  Plaintiffs also do not allege that any returns on their annuity products were
inconsistent in any respect with their expectations at any point in time.  In fact, Plaintiffs do not
allege they are unsatisfied with their annuity products in any respect.

Finally, Plaintiffs do not allege that anyone during the purchase process misrepresented
anything to them about their annuities or that they were subject to any of the "abuses" and
"aggressive sales tactics" in the selling of 403(b) products to which the Complaint more

---

[5] In the Complaint (¶¶ 102-106), Plaintiffs purport to recite several instances in which the current rates for various Crediting Parameters as disclosed on the Website allegedly differed from the rates appearing on a handful of quarterly statements.  Plaintiffs, however, are comparing apples and oranges.  They cite Website content as of March 20, 2023 (*see* Compl. nn.18-27) but compare it with account statements from *years earlier*.  *See* Compl. ¶¶ 102-106.  They offer no basis for their assumption that the Website content as of March 20, 2023 was the same as at the times of the cited account statements.

DEFENDANT'S MOTION TO DISMISS
*Hoffman, et al. v. Life Insurance Company of the Southwest*, No. 5:23-cv-04068

1  generally refers.[6]

2      **E.    This Lawsuit**

3      Plaintiffs sued on June 26, 2023.  Plaintiffs' theory of liability centers on the (incorrect

4  and novel) propositions that: (i) the Crediting Parameters are "fees" within the meaning of the

5  Statute; (ii) those "fees" were not adequately disclosed, largely because the Website, while

6  disclosing the guaranteed rates for Crediting Parameters, allegedly omits current rates or contains

7  outdated current rates; and thus (iii) these "fees" (*i.e.*, the current rates for Crediting Parameters)

8  cannot not be "charged."  *See* Compl. ¶¶ 98-99.  In other words, Plaintiffs protest that sometimes

9  LICS applied rates that were *more* favorable to policyholders than what they claim was

10  disclosed.  Plaintiffs are represented by a law firm that recently filed a raft of similar cases

11  against issuers of indexed annuities in California.[7]

12  **III.  ARGUMENT**

13      A motion to dismiss tests the legal sufficiency of the pleadings and allows a court to

14  dismiss a complaint upon a finding that the plaintiff has failed to state a claim upon which relief

15  may be granted.  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). The court may dismiss a

16  complaint as a matter of law for: "(1) lack of cognizable legal theory or (2) insufficient facts

17  under a cognizable legal claim."  *SmileCare Dental Grp. v. Delta Dental Plan of California, Inc.*,

18  88 F.3d 780, 783 (9th Cir. 1996) (citation omitted).  In so doing, a court need not accept legal

19  conclusions as true.  *Chavez v. Allstate Northbrook Indem. Co.*, 2023 WL 3773939, at *1 (S.D.

20  Cal. Apr. 13, 2023) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  Further, it is also

21  improper for the court to assume "the [plaintiff] can prove facts that [he or she] has not alleged."

22

23  [6] Plaintiffs also assert that LICS attained a competitive benefit vis-à-vis other insurers by
    supposedly violating disclosure requirements (Compl. ¶ 14)—a puzzling allegation given that

24  Plaintiffs' counsel filed similar complaints against the other insurers as well.  *See infra* n.7
    (listing cases).

25  [7] *See Blanchard, et al. v. Americo Fin. Life and Annuity Ins. Co.*, No. 5:23-cv-4087-NC (N.D.

26  Cal.); *Taylor, et al. v. Midland Nat'l Life Ins. Co.*, No. 5:23-cv-4125-NC (N.D. Cal.); *Bartlett, et
    al. v. North Am. Co. for Life and Health Ins.*, No. 5:23-cv-4123-NC (N.D. Cal.); *Jacobson, et al.*

27  *v. Metropolitan Life Ins. Co.*, No. 23STCV14788 (Cal. Sup. Ct., Los Angeles Cnty.).

28

1  *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459

2  U.S. 519, 526 (1983).

3        The UCL prohibits "any unlawful, unfair or fraudulent business act or practice."  Cal.

4  Bus. & Prof. Code § 17200.  "A business act or practice need only meet one of the three

5  criteria—unlawful, unfair, or fraudulent—to be considered unfair competition under the UCL."

6  *In re Actimmune Mktg. Litig.*, 2010 WL 3463491, at *5 (N.D. Cal. Sept. 1, 2010), *aff'd*, 464 F.

7  App'x 651 (9th Cir. 2011).  Plaintiffs allege a violation of the UCL under only the "unlawful"

8  and "unfair" prongs.  Compl. ¶¶ 143, 148.

9        The Complaint fails, however, for four reasons.  It: (i) fails to plead statutory injury under

10  the UCL; (ii) fails to state a UCL unlawfulness claim given the absence of a predicate violation

11  of the Statute; (iii) fails to state a UCL unfairness claim, which shares the same flaws as the

12  unlawfulness claim; and (iv) fails to establish entitlement to relief under the UCL.

13      **A.**     **The Complaint Fails to Establish Statutory Injury**

14        The UCL historically authorized any person acting for the interests of the general public

15  to sue notwithstanding a lack of injury.  *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350,

16  1359 (2010).  In 2004, however, California voters passed Proposition 64, which significantly

17  limited UCL standing as defined by California Business and Professions Code Section 17240.  *In*

18  *re Tobacco II Cases*, 46 Cal. 4th 298, 316 (2009).  "After Proposition 64 … a private person has

19  standing to sue only if he or she 'has suffered [an] injury in fact and has lost money or property

20  as a result of such unfair competition.'"  *Id*.  "The specific abuse of the UCL at which

21  Proposition 64 was directed was its use by unscrupulous lawyers who exploited the generous

22  standing requirement of the UCL" and "scour[ed] public records on the Internet for what [were]

23  often ridiculously minor violations of some regulation or law" and then "sue[d] that business in

24  the name of [a] front organization."  *Id.*  The "intent of California voters [in passing Proposition

25  64] was to limit such abuses by 'prohibiting private attorneys from filing lawsuits for unfair

26  competition where they have no client who has been injured in fact.'"  *Id.* at 316–317 (citations

27  omitted); *Rojas-Lozano v. Google, Inc.*, 159 F. Supp. 3d 1101, 1119 (N.D. Cal. 2016) ("The

28

requirement that injury be economic renders standing under the UCL substantially narrower than federal standing which may be predicated on a broader range of injuries.") (internal quotation marks omitted).

This lawsuit is exactly what Proposition 64 was intended to prevent. While the Complaint asserts (incorrectly) that LICS charged "fees" that were supposedly "high" and "undisclosed," it is devoid of allegations that Plaintiffs (1) suffered economic injury or (2) that such injury was *caused* by LICS's Website disclosures (or nondisclosures). *See Swearingen v. Late July Snacks LLC*, 2017 WL 4641896, at *3 (N.D. Cal. Oct. 16, 2017) ("Separate and apart from what the [California Education Code] requires to establish a violation, Plaintiffs must prove they have standing"—they "cannot seek UCL relief based on a strict liability theory."); *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1048 (9th Cir. 2017) (Plaintiffs cannot bring a UCL claim unless they can "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic injury*, and (2) show that that economic injury was the result of, i.e., *caused by*, the unfair business practice.") (citing *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 322 (2011)).

*First*, Plaintiffs fail to adequately allege they suffered an economic injury. The Complaint does not allege that any Plaintiff visited the Website, nor does it allege that any Plaintiff misunderstood the significance of the Crediting Parameters or how those parameters would be applied to their account balances. As a consequence, Plaintiffs fail to demonstrate that LICS's application of its Crediting Parameters to Plaintiffs' accounts resulted in *any* harm or injury, regardless of LICS's Website disclosures. These deficiencies are fatal after Proposition 64. *See e.g.*, *In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 804 (N.D. Cal. 2019) (dismissing UCL claim without leave to amend where plaintiffs failed to adequately allege they lost money or property). In fact, not only do Plaintiffs fail to allege an injury, in some instances the Complaint pleads that Plaintiffs experienced a *benefit* by receiving *more* of a return that what they may have expected from the Website disclosures. For example, Plaintiffs detail numerous scenarios in which Plaintiffs were "charged" a higher cap

13

than what was disclosed as the "minimum cap" on the Website.  *See* Compl. ¶ 104 (examples of Plaintiffs allegedly receiving more favorable caps than the guaranteed caps listed on the Website).  But taking these allegations as true, this means that, instead of having their returns capped at 1%, Plaintiffs instead received a *higher percentage* of their returns (*e.g.*, 3%, 4.4%, 5.5%) than what was disclosed on the Website.  This is the opposite of being injured.  *Top Gun, Ltd. v. Vector-US, Inc.*, 2017 WL 2687683, at *4 (Cal. Ct. App. June 22, 2017) (plaintiffs could not show they suffered actual economic injury because of defendant's actions where they still "received the full benefit of their bargain").  Or, in the parlance of the Statute:  California Education Code Section 25107 states that an undisclosed "fee" may not be charged; assuming the "cap" is a fee (which it is not) and further assuming that the guaranteed rate was disclosed on the Website (but that the *more favorable* current rate was not), Plaintiffs' flawed logic would mean LICS cannot "charge" the current rate but is free to "charge" the disclosed but less favorable guaranteed rate.  That, of course, makes no sense and cannot support a claim under the UCL.  *See e.g.*, *Peterson v. Cellco P'ship*, 164 Cal. App. 4th 1583, *1591-92 (Ct. App. 2008) (plaintiffs failed to articulate economic injury under the UCL where they claimed that defendant retained a portion of their insurance premiums as an unlawful commission but did not allege that they overpaid for the insurance because of such commission or otherwise could have acquired the policy for a lower price); *Mason v. Machine Zone, Inc.*, 140 F. Supp. 3d 457, 466 (D. Md. 2015), *aff'd*, 851 F.3d 315 (4th Cir. 2017) ("[T]he technical illegality of a transaction—where the consumer has received the full economic benefit of her bargain—will not trigger a private cause of action under the UCL.")

Second, the Complaint fails to establish—as it must—that Plaintiffs suffered an injury *as a result* of LICS's Website disclosures (or nondisclosures).  *See Kwikset Corp*, 51 Cal. 4th at 326 (holding that a UCL plaintiff must show a "causal connection" between the alleged economic injury and defendant's conduct); *Roffman v. Perfect Bar, LLC*, 2022 WL 4021714, at *6 (N.D. Cal. Sept. 2, 2022) (noting that *Kwikset*'s causation standard applies to UCL claims even where the underlying conduct is not fraud).  Plaintiffs, for instance, do not allege they ever visited—or

were even aware of—the Website, never mind used it as a basis to understand their product features or compare their products against others.  *See Roffman*, 2022 WL 4021714, at *6 ("without an allegation that Plaintiffs ever looked at [defendant's statement]—and thus ever knew one way or the other [about defendant's product]—there [wa]s no causal link between defendant's allegedly unlawful [act] and Plaintiffs' alleged harm"); *see also Doe v. Successfulmatch.com*, 2014 WL 1494347, at *5 (N.D. Cal. Apr. 16, 2014) ("Plaintiffs must, at a minimum, allege that they actually viewed the representations" and explain how it "would have impacted [their] decision").  Plaintiffs never even allege that LICS failed to provide them with timely, meaningful, and accurate information about their accounts, including through their contracts and quarterly account statements.  Nor do Plaintiffs allege they were unaware of the "fees" they challenge in the Complaint.  *See In re Turner*, 859 F.3d 1145, 1151 (9th Cir. 2017) (dismissing UCL claim without leave to amend because plaintiffs' alleged injury could not be tied to defendant's actions); *Dimas v. JPMorgan Chase Bank, N.A.*, 2018 WL 809508, at *10 (N.D. Cal. Feb. 9, 2018) (applying *In re Tobacco II Cases* to hold plaintiffs "failed to establish statutory standing under the UCL" by not alleging "that they suffered economic injury").

In sum, there is no pleaded injury or causation.  The Court should dismiss for lack of UCL standing.

**B.     The Complaint Fails to State an Unlawfulness Claim**

Under the UCL unlawfulness prong, a plaintiff must establish that a defendant engaged in conduct "forbidden by law … be it civil, criminal, federal, state, or municipal, statutory, regulatory, or court-made[.]"  *Sybersound Recs., Inc. v. UAV Corp.*, 517 F.3d 1137 (9th Cir. 2008).  Determining whether a defendant's conduct "expressly violated" the relevant law will "necessarily involve reference to and interpretation of the relevant [] statutes."  *Goldsmith v. Allergan, Inc.*, 2011 WL 2909313, at *6 (C.D. Cal. May 25, 2011).  Where the relevant statute is found not to apply, there is no predicate legal violation and a UCL claim will not lie.  *Id.*; *Williams v. Securitas Sec. Servs. USA, Inc.*, 2023 WL 5310937, at *7 (N.D. Cal. Aug. 16, 2023) (a claim under the UCL's unlawful prong "stands or falls on the predicate claims.").

Here, Plaintiffs base their UCL unlawfulness claim on an alleged predicate violation of Cal. Educ. Code §§ 25101, 25107. *See, e.g.*, Compl. ¶¶ 145-146. They principally assert that the current rates of Crediting Parameters are "fees" within the meaning of the Statute, such that the alleged failure to disclose them on the Website means those "fees" could not be "charged." This theory fails because: (i) the statutory disclosure obligations do not apply to discontinued products; and, even if it did, (ii) the Crediting Parameters are not "fees" within the meaning of the Statute.

### 1.    The Statute Does Not Apply to Discontinued Products

Plaintiffs allege that all or nearly all of Plaintiffs' LICS annuities are discontinued; meaning, they are no longer offered by LICS. *See* Compl. ¶¶ 77, 122. Plaintiffs complain that LICS allegedly did not update Product Pages for these products. However, there is no statutory requirement to update the Product Pages for discontinued products (or even to have a Product Page).[8] This is apparent for numerous reasons.

*First*, the statutory disclosure obligations on which the Complaint relies relate to ***offered*** products, not to discontinued products. Specifically, California Education Code Section 25104 requires the Board to establish an "information bank" (*i.e.*, the Website) and the statutory text makes clear that the information bank is required to contain information about ***offered*** products:

> The board shall maintain an impartial investment information bank, via an Internet Web site, containing the information required by Section 25101 about the retirement investment products ***offered*** by each registered vendor and objective comparisons of vendors and types of products.

Cal. Educ. Code § 25104(a) (emphasis added). The section does not create any obligation relating to discontinued products, or even refer to discontinued products.

Section 25101(a), in turn, specifies what must be disclosed with respect to each offered product. The first sentence of § 25101(a) states that the disclosure requirements apply to "[a] ***prospective vendor*** of 403(b) products that ***offers those products***…." Cal. Educ. Code § 25101

---

[8] In addition to being discontinued, the Complaint establishes that most of the Plaintiffs made their purchases outside the relevant statute of limitations.

DEFENDANT'S MOTION TO DISMISS
*Hoffman, et al. v. Life Insurance Company of the Southwest*, No. 5:23-cv-04068

(emphasis added).[9]  Section 25101 then repeats the terms "offer" and "prospective vendor" on numerous occasions.  *E.g.*, § 25101(a) (introducing list of required disclosures by stating, "[t]he ***prospective vendors*** shall provide the following information") (emphasis added); § 25101(a)(2) (requiring "[a] characterization by the vendor of ***its offering*** as either an annuity or custodial account") (emphasis added); § 25101(a)(4) (requiring disclosure of "[t]he types of products, product features, including presence of two tier annuity features, services ***offered*** to participants") (emphasis added).  Finally, Section 25101 tethers its registration and disclosure requirements to the ability to offer products: "Registered vendors shall ***offer*** only registered 403(b) products as funding vehicles for 403(b) plans."  § 25101 (emphasis added).  In contrast, *nothing* in § 25101 specifically, or the Statute generally, applies any disclosure requirements to discontinued products.  Thus, the statutory text is clear and ends the analysis—the disclosure requirement that underlies Plaintiffs' claim does not apply to discontinued products.  *See Schertzer v. Bank of Am., N.A.*, 445 F. Supp. 3d 1058, 1090 (S.D. Cal. 2020) (no UCL claim based on "unlawfulness" prong where "[a] plain reading of the [relevant] statute establishe[d] [defendants were] not required to display or disclose what, if any, [out of network] transaction fees [bank] may charge for balance inquiries."); *Chong v. Nestlé Waters N. Am., Inc.*, 2020 WL 7690175, at *8-9 (C.D. Cal. Nov. 30, 2020) (plaintiff failed to show "any predicate acts for her UCL unlawful prong claim" where there was "no basis" for her "interpretation" of a federal regulation), *aff'd*, 2021 WL 4938128 (9th Cir. Oct. 22, 2021).

*Second,* Plaintiffs' theory that LICS was required to update the Product Pages for discontinued products is not only incompatible with the text of the Statute, but also with how the Board structured the Website.  As described above, the Website *disallows editing* of Product Pages for discontinued products.  *See supra* at 8-9 (citing Ex. L).  This reality is significant under the Statute because the Board is empowered to choose the form of disclosure, and vendors must comply.  Cal. Educ. Code § 25101(c).  The Board exercised its authority and chose not to have

---

[9] The Statute's repeated use of the term "prospective vendor" further confirms that the disclosure requirements do not pertain to discontinued products.

DEFENDANT'S MOTION TO DISMISS
*Hoffman, et al. v. Life Insurance Company of the Southwest*, No. 5:23-cv-04068

Product Pages for discontinued products updated.

*Third,* although unnecessary to the outcome, there is a sound reason why the Statute and Website focus on offered products and do not require continual updates of Product Pages for discontinued products—existing policyholders receive this information directly from their insurer. For instance, Plaintiffs' contracts (Exs. M-T) disclose all contract terms including the mechanics of crediting strategies and the guaranteed rates for Crediting Parameters; quarterly account statements (Exs. U-V) disclose information including the current rates for Crediting Parameters. Indeed, when Plaintiffs assert that "fees" were "undisclosed," they point to their quarterly statements to establish the existence of the supposedly undisclosed "fees." Compl. ¶¶ 103, 105.

Plaintiffs posit that Website disclosure concerning discontinued products is nonetheless needed because a policyholder may wish to compare an existing product with a prospective product (*see* Compl. ¶ 68), but that is incorrect. As a threshold matter, the Website does not permit a user to run that comparison.[10] More importantly, however, California law provides an alternative and distinct mechanism for a policyholder to receive information in that scenario— California Insurance Code Section 10509.6, titled "Requirements for Replacement of Life Insurance and Annuity Policies" requires both the existing insurer and the prospective insurer to supply extensive information to the policyholder. As described above, annuity purchases are also subject to additional rigorous disclosure and suitability requirements.

*Finally*, although Plaintiffs are complaining about discontinued products, even for offered products, there would be no statutory requirement to update current rates on the Website. Complaint paragraph 68 asserts that California Education Code Section 25102

---

[10] The Website has a "Compare Products" page that allows a user to select "my product" and then select other products for comparison. *See* Exs. D-K; *Compare Products*, 403bCompare, https://www.403bcompare.com/ProductCompare. But the Website does not allow a user to select a discontinued product as "my product," meaning one cannot run a comparison based on their discontinued product. This, of course, also confirms that the Board did not intend the Website to be used for discontinued products.

DEFENDANT'S MOTION TO DISMISS
*Hoffman, et al. v. Life Insurance Company of the Southwest*, No. 5:23-cv-04068

requires vendors continually to "update the details" of their products on the Website—by which

Plaintiffs mean continually update current rates for Crediting Parameters.  Compl. ¶ 68.  That is

not what the Section provides.  Section 25102 provides that "[r]egistration shall be offered to

vendors once annually, and renewal of registration shall be required at least once every five

years thereafter …."  Cal. Educ. Code § 25102.  It goes on to state that "[t]he board *may*

*require*, through a password-based update system that allows vendors to access the registration

list for the purposes of updating their product information, or through other means, an update of

the information required to be provided under Section 25101 with *each registration renewal*."

*Id.* (emphasis added).  At most, the Statute allows the Board to require updates *during a*

*renewal process* as little as every five years—a far cry from Plaintiffs' assertion that the Statute

imposes an onerous ongoing update requirement.  Further, there is no allegation that the Board

ever acted on its permissive authority (*i.e.*, "may require") to require product updates even upon

the five-year renewals.  *See generally* Compl.

      Accordingly, the Court should dismiss because: (i) there exists no statutory disclosure

obligation relating to discontinued products, and (ii) as such, LICS did not violate the Statute

even accepting Plaintiffs' assertion that Product Pages were missing or outdated.  *See Iron*

*Bridge Mortg. Fund, LLC v. Bank of Am., N.A.*, 539 F. Supp. 3d 1030, 1040 (N.D. Cal. 2021)

(claim under UCL's unlawful prong failed because plaintiff could not allege a predicate violation

of the California Commercial Code).[11]

### 2.    Crediting Parameters Are Not "Fees"

      Plaintiffs' claim is also subject to dismissal because the Crediting Parameters the

Complaint attacks are not "fees" within the meaning of the statutory prohibition on charging

---

[11] With respect to Plaintiffs' doubt about whether one of their purchases concerns a discontinued product (Compl. ¶ 122), given the absence of any allegation that they hold an offered product, the Court should dismiss given Plaintiffs have the burden to plead a claim.  *See Forsyth v. HP Inc.*, 2020 WL 2524517, at *6 (N.D. Cal. May 18, 2020) ("improper for the court to assume 'the [plaintiff] can prove facts that [he or she] has not alleged....'") (quoting *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 526 (1983)).

undisclosed fees.  *See* Cal. Educ. Code § 25107 ("[a] vendor may not charge a fee associated with a registered 403(b) product that is not disclosed, pursuant to Section 25101.").[12]

The Statute does not define "fee."  *See generally* Statute.  Instead, the legislature charged the Board with doing so.  Specifically, Section 25106 requires the Board to include on the Website: "[d]efinitions or explanations of all fees referred to in the investment information bank." Cal. Educ. Code § 25106(c).[13]  The Website does so via the Glossary.  The Glossary contains a definition of "Fee (products)": "[p]roduct fees are fees, charges, and expenses associated with the opening of and contributing to a 403(b) account." Ex. B.  Crediting Parameters do not meet that definition—they are not fees, charges or expenses associated with opening or contributing to an annuity.  Indeed, there can be no doubt the Board did not intend for the definition of "fees" to capture Crediting Parameters because the Glossary separately defines "Caps, Spread, and Participation" in a manner that does not refer to those items as fees. Ex. A.  Further, as detailed above, on the Product Pages, the Board chose to place information about "Caps, Spread, and Participation" under the "Product Details" tab and not the "Fees and Charges" tab.  Exs. D-K.  This is dispositive; the Board—the body statutorily charged with defining "all fees"—does not define or treat Crediting Parameters as fees.[14]

Moreover, dictionary definitions of "fee" are also uniformly consistent with the conclusion that Crediting Parameters are not fees.  Merriam Webster defines "fee" as "a fixed

---

[12] To be precise, even Plaintiffs do not refer to the Crediting Parameters as "fees."  Instead, Plaintiffs employ a self-serving concept that they created and labeled "indirect fees" (*e.g.*, Compl. ¶¶ 86-95).  However, neither the Website nor the Statute refers to "indirect fees." Plaintiffs also in Compl. ¶ 84 assert that some products have a "low fixed rate of return" to "take fees out of returns."  This assertion is irrelevant as the indexed annuities at issue do not have a fixed rate of return.

[13] Complaint footnote 12 incorrectly asserts that California Education Code Section 25106 instructs that the Board "should look to" SEC, IRS, and NAIC literature for definitions of fees. That is not what the Section states.  Rather, Section 25106 states that the Board should include SEC, IRS, and NAIC literature on the Website.  It says nothing about consulting such authorities for definitions.

[14] Plaintiffs also concede that LICS does not refer to Crediting Parameters as fees.  *See* Compl. at 16 n.11.

DEFENDANT'S MOTION TO DISMISS
*Hoffman, et al. v. Life Insurance Company of the Southwest*, No. 5:23-cv-04068

charge" or "a sum paid or charged for a service."   Ex. X.  The Cambridge Dictionary defines

"fee" as "an amount of money charged for a service or for the use of something; *admission fee*;

*The doctor's usual fee is $125*."  Ex. Y.  Crediting Parameters do not qualify as fees under any of

these definitions. *See Pacific Coast Fed'n of Fishermen's Ass'ns v. Glaser*, 945 F.3d 1076, 1084

(9th Cir. 2019) (courts "may consult dictionary definitions in an attempt to capture the common

contemporary understandings of a word" in statutory text); *Song fi Inc. v. Google, Inc*., 108 F.

Supp. 3d 876, 882 (N.D. Cal. 2015) (noting that courts follow the "common practice of

consulting dictionary definitions" to determine the ordinary meaning of undefined terms in

statutes) (internal quotation marks omitted).

As for the Statute itself, while it does not define fee, it repeatedly refers to fees in a

manner consistent with the Glossary and dictionary definitions, *i.e.,* payment of a sum certain for

a service.  For instance, Section 25101(a)(3) refers to "expenses" and then provides a non-

exhaustive list of expenses including several fees: "management fees," "annual fees," "product

fees."  Sections 25102, 25103, and 25108 establish a regime for assessing yearly "fees" to

vendors to fund the Website—again a typical "fee," *i.e.*, a sum certain paid for a service.  And

nothing in the Statute supports the proposition that Crediting Parameters are fees.

Finally, the annuity brochure published by the National Association of Insurance

Commissioners ("NAIC") (cited at Compl. ¶ 93 and attached as Ex. Z), while not purporting to

address the statutory meaning of "fees," likewise does not treat Crediting Parameters as fees.

The brochure differentiates fees from Crediting Parameters.  Page 7 has a box titled "Annuity

Fees and Charges" that lists the fees: "contract fee," "percentage of purchase payment,"

"premium tax," and "transaction fee."  Ex. Z at 7.  Crediting Parameters are not included.

Instead, a *separate portion of the brochure* contains a box titled "How Insurers Determine

Indexed Interest" that describes Crediting Parameters.  *Id.* at 6.[15]

---

[15] Complaint ¶ 92 refers to an SEC publication.  While the SEC does not regulate the products at
issue (because they are not securities), the publication does not attempt to define fees.  *See
Updated Investor Bulletin: Indexed Annuities*, SEC, https://www.sec.gov/oiea/investor-alerts-

DEFENDANT'S MOTION TO DISMISS
*Hoffman, et al. v. Life Insurance Company of the Southwest*, No. 5:23-cv-04068

For all these reasons, Crediting Parameters are not fees within the meaning of the Statute. Instead, they are (as the Glossary makes clear), "moving parts" in the calculation of annuity interest for crediting strategies that can either increase or decrease annuity credit vis-à-vis the market index return.  Ex. A.[16]

Accordingly, the Court should dismiss the unlawfulness claim.[17]

### C.    The Complaint Fails to State an Unfairness Claim

The Complaint also asserts that LICS violated the UCL unfairness prong through allegations that simply relabel the unlawfulness claim with no independent substance.  Compl. ¶¶ 149-151; *see also id.* ¶ 148 ("Defendant's conduct, *as described herein,* also violates the UCL's "unfair" prong as Defendant's conduct is unfair to consumers . . .") (emphasis added). Given that the unlawfulness claim and the unfairness claim share a common predicate, dismissal of the unfairness claim follows from a dismissal of the unlawfulness claim.  "[C]ourts in this district have held that where the unfair business practices alleged under the unfair prong of the UCL overlap entirely with the business practices addressed in the … unlawful prong[] of the UCL, the unfair prong of the UCL cannot survive if the claims under the other … prong[s] of the UCL do not survive."  *Mai v. Supercell Oy*, 2023 WL 25713, at *6 (N.D. Cal. Jan. 3, 2023); *Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1094 (N.D. Cal. 2022) (dismissing UCL

---

and-bulletins/ib_indexedannuities (Jul. 31, 2020).

[16] The Crediting Parameters also do not make sense to conceptualize as fees because, as the Glossary (Ex. A) recognizes, they are not necessarily disadvantageous to policyholders.  For instance, a cap only matters if market returns are sufficiently high, and policyholders benefit from the corresponding floor of 0% interest—together creating a collar.  Further, participation rates can exceed 100%, in which case they amplify the market return.  Moreover, the statutory prohibition on "charging" undisclosed fees (Cal. Educ. Code § 25107) becomes nonsensical as applied to the Crediting Parameters—what does it mean not to "charge" a participation rate?

[17] The legislative history of California Education Code Section 25107 provides an additional basis for dismissal, by demonstrating that the charging of fees on offered products is prohibited only if the Website omits the entire product.  In 2004, the section was amended to add the words "associated with a registered 403(b) product", thereby clarifying the correctness of this interpretation.  *See* Stats 2004 ch 912 § 26 (AB 2233).  This provides another distinct basis for dismissal of the claims of Plaintiffs Hoffman, Fallas, Oxx, Stokes, White, and De Altonaga, who acknowledge the Website discloses their products.

claim on both unlawful and unfair prongs where underlying allegation that "[defendant] collected sensitive personal data without proper disclosure to gain unfair advantage over its rival companies" was "the same"); *Eidmann v. Walgreen Co.*, 522 F. Supp. 3d 634, 647 (N.D. Cal. 2021) (dismissing UCL claim under "unfair[ness]" prong where "claim consists entirely of the allegations also proffered to support [plaintiff's] claim under the fraudulent prong of the UCL."), *appeal dismissed*, 2021 WL 4785889 (9th Cir. May 17, 2021); *Sidhu v. Bayer Healthcare Pharm. Inc.*, 2022 WL 17170159, at *9 (N.D. Cal. Nov. 22, 2022) (similar).[18]

**D.    The Complaint Fails to Establish Entitlement to Relief Under the UCL**

As a final basis for dismissal, the Complaint fails to plead that Plaintiffs are entitled to relief under the UCL.  Plaintiffs do not even attempt to allege—as they must—that "[plaintiffs] lack[] an adequate legal remedy" (*see generally* Compl.), which is fatal to their claim.  *Chavez*, 2023 WL 3773939, at *2 (citing *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020) (dismissing UCL claim where "the operative complaint d[id] not allege that [plaintiff] lack[ed] an adequate legal remedy."); *Johnson v. Trumpet Behavioral Health, LLC*, 2022 WL 74163, at *3 (N.D. Cal. Jan. 7, 2022) ("[M]ost district courts applying *Sonner* have … 'understood it to require that a plaintiff must, at a minimum, *plead* that she lacks adequate remedies at law if she seeks equitable relief.'") (emphasis in original).  *See also Taylor v. Sam's W., Inc.*, 2020 WL 12947974, at *4 (C.D. Cal. Oct. 7, 2020) ("[W]hether a UCL claim is pleaded as the sole or an alternative remedy," the complaint "must allege that [plaintiff] lacks an adequate legal remedy").

Moreover, with respect to their request for injunctive relief, Plaintiffs allege vaguely that "Plaintiffs and the Class [] seek injunctive relief requiring Defendant to provide the required

---

[18] It does not matter that, in pleading unfairness, instead of labeling the alleged misconduct as "unlawful," Plaintiffs label it as "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers" (Compl. ¶ 149).  *See Coffee v. Google*, LLC, 2022 WL 94986, at *13 (N.D. Cal. Jan. 10, 2022) (rejecting contention that defendant's "conduct [wa]s 'immoral and unscrupulous,'" where "[t]here [wa]s complete overlap between Plaintiffs' unlawful prong claim and their … unfair prong claim" and "the only difference between the two claims is Plaintiffs' characterization of [the conduct] as illegal or merely immoral.").

DEFENDANT'S MOTION TO DISMISS
*Hoffman, et al. v. Life Insurance Company of the Southwest*, No. 5:23-cv-04068

disclosures moving forward, which will safeguard against future illegal practices by Defendant." Compl. ¶ 16. Such a general pronouncement does not suffice. *In re Nexus 6P Prods. Liab. Litig.*, 293 F. Supp. 3d 888, 954 (N.D. Cal. 2018) ("[A] plaintiff cannot seek injunctive relief on behalf of the public unless he is individually entitled to such relief."). Rather, "[u]nless the named plaintiffs are themselves entitled to seek injunctive relief, they may not represent a class seeking that relief." *Sousa v. Walmart, Inc.*, 2023 WL 1785960, at *7 (E.D. Cal. Feb. 6, 2023) ("[T]o the extent Plaintiff attempts to rely on the unnamed putative class members' potential future harm as the basis for … injunctive relief, that argument fails.") (internal quotation marks omitted). Here, no Plaintiff has alleged that he or she would be harmed if LICS fails to revise its Website disclosures, nor would any such allegation make sense because Plaintiffs no longer own their products and/or the products are discontinued such that no one in the future could purchase them. Further, as described above, the Board has the statutory authority to determine what must be disclosed on the Website and injunctive relief would in effect require insurers to go beyond what the Board has determined to include.

## IV.   CONCLUSION

The Court should grant this Motion and dismiss the Complaint. Moreover, dismissal should be with prejudice because the defects identified herein are not curable by amendment— they are infirmities flowing from Plaintiffs' incorrect interpretation of the Statute. *See Mai*, 2023 WL 25713, at *7 (N.D. Cal. Jan. 3, 2023) (finding amendment of UCL claim would be futile "[i]n light of the Court's findings" that the conduct at issue was not illegal and "[p]laintiffs [could not] state a claim based on the allegedly unfair effects of the [conduct]"); *Coffee*, 2022 WL 94986, at *14 (finding amendment of a UCL claim "would be futile in light of the Court's determinations that [the conduct at issue was] not illegal [] and that Plaintiffs cannot state a claim based on their subjective view that [the conduct] [was] harmful and immoral.").

Dated: September 11, 2023          */s/ Jessica Lewis*
                                   JESSICA LEWIS (SBN 302467)

jessica.lewis@wilmerhale.com
WILMER CUTLER PICKERING
   HALE AND DORR LLP
One Front Street, Suite 3500
San Francisco, CA 94111
Telephone: (628) 235-1160
Facsimile: (628) 235-1001

TIMOTHY PERLA (admitted *pro hac vice*)
timothy.perla@wilmerhale.com
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

*Attorneys for Defendant*
*Life Insurance Company of the Southwest*

DEFENDANT'S MOTION TO DISMISS
*Hoffman, et al. v. Life Insurance Company of the Southwest*, No. 5:23-cv-04068