Joshua P. Davis, Bar No. 193254
jdavis@bm.net
BERGER MONTAGUE PC
505 Montgomery Street, Suite 625
San Francisco, CA 94111
T. 415.215.0962
F. 215.875.4604

John G. Albanese*
jalbanese@bm.net
Ariana B. Kiener*
akiener@bm.net
BERGER MONTAGUE PC
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
T. 612.594.5999
F. 612.584.4470

Carl F. Engstrom*
cengstrom@engstromlee.com
Mark E. Thomson*
mthomson@engstromlee.com
ENGSTROM LEE LLC
729 N Washington Ave., Suite 600
Minneapolis, MN 55401
T. 612.305.8349

*admitted pro hac vice

Counsel for All Plaintiffs

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| Scott Hoffman, Barry Blisten, Deann Fallas, Gerry Oxx, Damon Stokes, Susan Strozewski, Sarah White, Maria De Altonaga, Danielle Krimbow, Siu Lynne Lui, and Julie Gallagher, individually and as representatives of the Class,<br><br>Plaintiffs,<br><br>vs.<br><br>Life Insurance Company of the Southwest,<br><br>Defendant. | Case No. 5:23-cv-04068-PCP<br><br>**FIRST AMENDED COMPLAINT FOR RESTITUTION AND INJUNCTIVE RELIEF**<br><br>**CLASS ACTION**<br><br>(1) Violations of California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*<br><br>**DEMAND FOR JURY TRIAL** |

COME NOW, Scott Hoffman, Barry Blisten, Deann Fallas, Gerry Oxx, Damon Stokes, Susan Strozewski, Sarah White, Maria De Altonaga, Danielle Krimbow, Siu Lynne Lui, and Julie Gallagher ("Plaintiffs"), on behalf of themselves and the Class set forth below, and state as follows:

**INTRODUCTION**

1.     This case is brought as a class action on behalf of California public school educators against Defendant Life Insurance Company of the Southwest ("Defendant" or "LSW") for charging teachers millions of dollars in undisclosed and unauthorized fees on their supplemental retirement savings plans, in violation of Cal. Educ. Code § 25100, *et seq.* (the "Code"), as well as the California Unfair Competition Law, Cal. Bus. & Prof. Code, § 17200, *et seq*. (the "UCL").

2.     California is home to more than 300,000 public school teachers. For most of them, the funds provided by the state's pension system for educators will not be enough to finance their golden years, so the vast majority of teachers supplement their pensions with personal retirement savings plans.

3.     Teachers' personal retirement savings are often invested in retirement plans offered by their school districts pursuant to a provision of the federal tax code, 26 U.S.C. § 403(b), that allows public schools and 501(c)(3) non-profits to offer employees tax advantaged employer-sponsored retirement plans. These plans are commonly referred to as 403(b) plans and offer different investment options, including annuity contracts provided through insurance companies and custodial accounts invested in mutual funds.

4.     The 403(b) market for California teachers has long been rife with abuse, including aggressive sales tactics, hidden (and astronomical) fees, and poor returns on investments.

5.     Lobbied by insurance companies, the California Legislature adopted Section 770.3 of California's Insurance Code, which provides that school districts must remit payroll deductions to whichever provider an employee chooses. *See* Cal. Ins. Code § 770.3. This opened the door for all 403(b) vendors into California schools, where they quickly set up in teachers' lounges with glossy brochures and free baked goods.

6.     For many years, these vendors had no obligation to disclose to educators the full set

of fees associated with their investment products. As a result of insurance companies' aggressive marketing tactics and incomplete disclosures, teachers were often funneled into indexed annuities that came with high fees and low returns while providing huge profits for the insurance companies peddling them.

7.     To correct this injustice, the California Legislature passed the Code, which requires 403(b) vendors to provide certain information about their products on a publicly accessible website, 403bcompare.com ("the Website"), so that teachers can make informed decisions about what investments to hold in their supplemental retirement plans. Indeed, the very URL of the Website underscores its purpose: to allow educators to *compare* their 403(b) options.

8.     Perhaps the biggest change ushered in by the Code was a requirement that 403(b) vendors must fully disclose all "expenses paid directly or indirectly by plan participants." As defined by the statute, the expenses that must be disclosed include all fees, "including, but not limited to… management fees, and annual fees[.]" *See* Cal. Educ. Code § 25101(a)(3). 403(b) vendors are prohibited from charging fees that are not so disclosed. *See* Cal. Educ. Code § 25107.

9.     The Code's emphasis on disclosures is intentional. When insurance companies, mutual fund companies, and broker-dealers fully disclose their fees—both direct and indirect— teachers can meaningfully compare products both when they initially select 403(b) plans, and as they reevaluate their investment strategies (*e.g.*, when they consider replacing an old 403(b) plan with a new one) on an ongoing basis. This transparency allows California's educators to make informed decisions when planning for retirement.

10.     Disclosure of fees also keeps the 403(b) marketplace competitive. When fees are fully disclosed, vendors are incentivized to keep their fees low to attract teachers to their plans.

11.     Full disclosures also ensure that mutual fund companies, broker-dealers, and insurance companies compete on a level playing field; that is, when all companies disclose their fees, no one company is allowed to unfairly benefit and to lure unsuspecting investors by hiding some or all of its fees.

12.     Defendant—a nationwide life insurance and annuity company and one of California's

largest and most profitable 403(b) vendors—systematically violates the Code. Specifically, Defendant fails to disclose on 403bcompare.com numerous hefty expenses, direct and indirect, that it passes on to California's public school teachers who purchase Defendant's indexed annuities. For example, Defendant fails to disclose that its fees are among the highest in the state—averaging over 3.4% per year since 2019—and that its sales agents are among the highest paid—earning commissions between 8 and 10 percent of assets invested—all of which have resulted in Defendant's customers seeing some of the state's lowest returns on their investments. Fees this high are disastrous for teachers trying to save for retirement, cutting their nest egg nearly in half by the time of their retirement.

13.    The below illustration[1] demonstrates the impact that differences in fees have on annuity returns over time:



**BY THE NUMBERS**
Total value of investment after 35 years, assuming $250 contributed monthly with an 6% average annual return:

14.    Defendant's conduct, which violates the Code, has enabled Defendant to thrive in the California 403(b) market for public school teachers—at the expense of educators and those 403(b) vendors that *do* comply with the Code's disclosure requirements. By hiding its fees, Defendant has lured unsuspecting teachers into its poorly performing products and away from better products sold by vendors that disclose their fees, as required.

---

[1] Illustration taken from https://403bwise.org/education/bad-403b (last visited Mar. 20, 2023).

15.     Plaintiffs are such teachers. For example, over the last several years, Plaintiff Strozewski has paid thousands of dollars to Defendant in unlawful, undisclosed fees on her poorly performing indexed annuity.

16.     On behalf of themselves and a Class of similarly situated individuals, Plaintiffs bring claims pursuant to the UCL seeking redress for Defendant's unlawful and unfair conduct. Under California law, Plaintiffs and the Class are entitled to equitable restitution. Plaintiffs and the Class also seek injunctive relief requiring Defendant to provide the required disclosures moving forward, which will safeguard against future illegal practices by Defendant.

**PARTIES**

17.     Individual and representative Plaintiff Scott Hoffman ("Hoffman") is a resident of San Jose, California. Hoffman is a teacher in the Oak Grove School District and has been teaching for the past 23 years.

18.     Hoffman has been invested in a 403(b) product offered by Defendant called FIT Rewards Growth from 2019 to the present. Within the past four years, Hoffman has incurred fees within this product that were illegal pursuant to Cal. Educ. Code §§ 25101, 25107 because they were not disclosed as required by the Code.

19.     Individual and representative Plaintiff Barry Blisten ("Blisten") is a resident of Lake View Terrace, California. Blisten works as a special education teacher within the Los Angeles Unified School District, where he has worked the past 23 years.

20.     Blisten has been invested in a 403(b) product offered by Defendant called Fit Income Plus from 2018 to the present. Within the past four years, Blisten has incurred fees within this product that were illegal pursuant to Cal. Educ. Code §§ 25101, 25107 because they were not disclosed as required by the Code.

21.     Individual and representative Plaintiff Deann Fallas ("Fallas") is a resident of Bakersfield, California. Fallas has been an elementary school teacher in the Delano Union School District for 17 years.

22.     Fallas was invested in a 403(b) product offered by Defendant called SecurePlus

-4-

Paramount 5 from 2014 until early 2023. Within the past four years, Fallas has incurred fees within this product that were illegal pursuant to Cal. Educ. Code §§ 25101, 25107 because they were not disclosed as required by the Code.

23.    Individual and representative Plaintiff Gerry Oxx ("Oxx") is a resident of Signal Hill, California. Oxx worked as a school counselor and special education teacher for 41 years, retiring from the Santa Ana Unified School District in 2017.

24.    Oxx has been invested in two 403(b) products offered by Defendant within the past four years. He was invested in the product called SecurePlus Elite from 2009 to 2023, and he was invested in the SecurePlus Platinum product from 2004 to 2023. Within the past four years, Oxx has incurred fees within each of these products that were illegal pursuant to Cal. Educ. Code §§ 25101, 25107 because they were not disclosed as required by the Code.

25.    Individual and representative Plaintiff Damon Stokes ("Stokes") is a resident of Norwalk, California. Stokes has worked as a Resource Specialist Teacher in Compton Unified School District for the past 25 years.

26.    Stokes has been invested in a 403(b) product offered by Defendant called SecurePlus Platinum from 2014 to the present. Within the past four years, Stokes has incurred fees within this product that were illegal pursuant to Cal. Educ. Code §§ 25101, 25107 because they were not disclosed as required by the Code.

27.    Individual and representative Plaintiff Susan Strozewski ("Strozewski") is a resident of Orange, California. Strozewski was an elementary school teacher who retired from Orange Unified School District in 2013.

28.    Strozewski has been invested in a 403(b) product offered by Defendant called SecurePlus Silver from 2005 to early 2023. Within the past four years, Strozewski has incurred fees within this product that were illegal pursuant to Cal. Educ. Code §§ 25101, 25107 because they were not disclosed as required by the Code.

29.    Individual and representative Plaintiff Sarah White ("White") is a resident of Pasadena, California. White started teaching in 2018, and currently teaches science in the Los

Angeles Unified School District.

30.     White has been invested in a 403(b) product offered by Defendant called SecurePlus Platinum from 2019 to the present. Within the past four years, White has incurred fees within this product that were illegal pursuant to Cal. Educ. Code §§ 25101, 25107 because they were not disclosed as required by the Code.

31.     Individual and representative Plaintiff Maria De Altonaga ("De Altonaga") is a resident of Hayward, California. Before recently retiring, De Altonaga spent the prior 18 years as a Bilingual Alternative General Education Teacher in elementary schools within the Hayward Unified School District.

32.     De Altonaga has been invested in a 403(b) product offered by Defendant called SecurePlus Paramount 5 from 2017 to the present. Within the past four years, De Altonaga has incurred fees within this product that were illegal pursuant to Cal. Educ. Code §§ 25101, 25107 because they were not disclosed as required by the Code.

33.     Individual and representative Danielle Krimbow ("Krimbow") is a resident of Corona, California. Krimbow has been a teacher for seven years, and currently works in the Downey Unified School District.

34.     Krimbow was invested in a 403(b) product offered by Defendant called SecurePlus Platinum from September 17, 2019 through 2023. Within the past four years, Krimbow has incurred fees within this product that were illegal pursuant to Cal. Educ. Code §§ 25101, 25107 because they were not disclosed as required by the Code.

35.     Individual and representative Siu Lynne Lui ("Lui") is a resident of Los Angeles, California. Lui was a teacher for eight years in Los Angeles Unified School District.

36.     Lui has been invested in a 403(b) product offered by Defendant called SecurePlus Platinum from 2015 to the present. Within the past four years, Lui has incurred fees within this product that were illegal pursuant to Cal. Educ. Code §§ 25101, 25107 because they were not disclosed as required by the Code.

37.     Individual and representative Julie Gallagher ("Gallagher") is a resident of Phelan,

California. Gallagher has been a teacher for 29 years, spending the first 27 years of her career in Snowline Joint Unified School District, and the past two years in Barstow Community College District.

38.     Gallagher has been invested in a 403(b) product offered by Defendant called SecurePlus Platinum from 2009 to the present. Within the past four years, Gallagher has incurred fees within this product that were illegal pursuant to Cal. Educ. Code §§ 25101, 25107 because they were not disclosed as required by the Code.

39.     Defendant LSW is wholly owned by National Life Insurance Company.[2] LSW and its affiliates operate under the trade name of National Life Group, offering financial service and retirement products.

40.     LSW is incorporated in Texas and its principal place of business is Addison, Texas.

41.     LSW sells annuities, life insurance, and investments in 49 states (including California) and the District of Columbia, and tens of thousands of independent agents are registered to sell its insurance products.[3]

## JURISDICTION AND VENUE

42.     This case was initially filed in the Superior Court for Santa Clara County, California. Defendant removed the case to this Court under 28 U.S.C. § 1441(a) asserting that jurisdiction was appropriate under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) and 28 U.S.C. § 1453(b).

43.     Defendant conducts business, including advertising and selling life insurance and annuity products, in the state of California.

44.     Venue is appropriate in this District under 28 U.S.C. § 1441(a).

45.     **Divisional Assignment.**  Per Civil L.R. 3-2(e), because this case was removed from Santa Clara County, it is appropriate to assign the case to the San Jose division.

---

[2] In turn, National Life Insurance Company is wholly owned by NLV Financial Corporation, which is itself wholly owned by National Life Holding Company.
[3] *See* https://www.nationallife.com/OurStory-OurHistory (last visited Mar. 20, 2023).

**BACKGROUND**

A. **Overview of Retirement Landscape for California Public School Teachers: CalSTRS and 403(b) Annuities.**

46.     The California State Teachers' Retirement System ("CalSTRS") was established in 1913 to provide retirement benefits to California's public school educators via a pension.

47.     Today, CalSTRS administers retirement programs for about 880,000 members and is the largest educator-only pension fund in the world, and the second largest pension fund in the U.S.

48.     Importantly, California public school teachers do not contribute to or receive Social Security benefits. Instead, they only contribute to and receive benefits from CalSTRS. And, increasingly, the pension provided by CalSTRS is not enough to finance a teacher's retirement.

49.     According to CalSTRS, the average teacher who retired in 2020–21 had 25 years of service and a monthly benefit of $4,813, or $57,756 a year.[4]

50.     As the California Teachers Association warns, this "pension will not cover 100% of the income [teachers] need to live on in retirement . . . [F]or most people, their pension will cover only about 50% to 65% of the income they will need in retirement."[5]

51.     Between not receiving any Social Security benefits and the fact that CalSTRS does not provide sufficient retirement income, many California public school teachers decide to open supplemental personal retirement accounts, in the form of 403(b) plans, to hopefully accumulate enough funds to retire at a similar standard of living.

52.     The California Teachers Association urges its members to open a 403(b): "To help make sure you have enough income to live on in retirement, it is important to start a personal retirement savings plan, such as a 403(b)." [6]

53.     Similar to 401(k) plans, a 403(b) plan allows investors to contribute pre-tax money from their paychecks to certain investment products. Pre-tax contributions and investment earnings

---

[4]   *See*   https://edsource.org/2022/teachers-retirement-investments-had-a-negative-return-for-first-time-since-great-recession/676191 (last visited Mar. 20, 2023).
[5]   *See*   https://ctainvest.org/the-academy/your-retirement-journey/overview-of-retirement-benefits (last visited Mar. 20, 2023).
[6] *Id.*

are not taxed until the money is withdrawn, usually in retirement. This allows money to grow tax free over time, and to be withdrawn at a time when many teachers' tax brackets will presumably be lower than when they were working full-time.

54.     In 1961, the insurance industry introduced the "tax-sheltered annuity" (or "TSA"). Between 1961 and 1974, only TSAs were allowed in 403(b) plans.

55.     In 1974, Congress passed the Employee Retirement Income Security Act ("ERISA"), allowing mutual funds to be used within 403(b) plans.

56.     Currently, there are two main types of investments allowed in 403(b) plans: (1) mutual funds, which are pooled investments owned by many investors and sold by mutual fund companies, and (2) annuities, which are individual insurance products sold by insurance companies.

57.     Despite the fact that mutual funds have been allowed in 403(b) plans for nearly fifty years, insurance providers selling annuities have held onto a large share of the 403(b) market in California. This is true for two primary reasons. First, mutual fund companies were slow to enter the California 403(b) market after the passage of ERISA. Second, insurance companies successfully lobbied the California Legislature to amend state insurance law to prevent school districts from negotiating terms with particular insurance providers and to instead provide that school districts must remit payroll deductions to whichever insurance provider an employee chooses. *See* Cal. Ins. Code § 770.3. This gave insurance companies direct access to educators. It also prohibited school districts from excluding vendors based on the quality of their products or the level of their fees, even though such exclusions are typical for employers who offer 401(k) plans.

58.     In summary, but for the disclosures required by the Code, educators deciding how to invest their 403(b) plan have little in the way of reliable information. There is no guidance from school districts and little guidance from the state about what to invest in. And there are no restraints on which vendors can offer products, which agents are allowed to offer those products (agents need not obtain securities licensure), the tactics those agents can use, or how those agents are compensated. As a result, but for the information required to be disclosed by the Code, most teachers would pick investments based on the advice of commissioned salespeople, who themselves offer the products

that pay them the highest commissions. These commissioned salespeople continue to funnel California public school teachers into the 403(b) products that pay them the highest commissions: annuities.

59.    The Code was intended to break the hold of annuity vendors, by affirmatively providing truthful and relevant investment information to teachers.

**B. Common Types of Annuities.**

60.    An annuity is a contract between an individual and insurance company under which the individual makes a lump-sum payment or series of payments and, in return, receives a promise of regular disbursements from the insurance company for a specified future period of time or for the remainder of the individual's life.[7] In an *immediate annuity*, the payments start at the time of the initial investment. In a *deferred annuity*, the payments start at some future date decided by the investor, or the money can be withdrawn and the account closed. Until that time, the payments earn interest. This case concerns deferred annuities.

61.    There are several types of deferred annuities including fixed annuities and variable annuities. This case concerns a third kind of deferred annuity referred to as an indexed annuity.

62.    An indexed annuity (also known as an index annuity, an equity-indexed annuity, a fixed indexed annuity, or an index-linked annuity) pays an interest rate tied to the performance of a specified market index, such as the S&P 500 or the Dow Jones Industrial Average. The insurance company does not invest the investor's money in that underlying market index, but instead invests the money in its general account. The insurance company uses a portion of the earnings it expects to generate to buy derivative instruments that capture a portion of the market's returns, which are then passed along to investors (in part). The insurance company then keeps the rest of the returns generated by the derivatives for itself along with the unused portion of the earnings from its general account.

**C. The Problems with the 403(b) Marketplace for California Teachers, and the State Legislature's Attempt to Fix It.**

63.    As discussed above, but for the disclosures required by the Code, California teachers

---

[7] *See* https://www.investopedia.com/terms/a/annuity.asp (last visited Mar. 20, 2023).

were left on their own to make decisions about their retirement savings and have been largely funneled into high-cost indexed annuities. These annuities often involve opaque earnings formulas and high (and confusing) fees, which result in exorbitant profits for insurance companies and low returns for educators.

64.     Making matters worse is the fact that California teachers have historically been confronted by an overwhelming number of 403(b) options, which vary greatly across school districts. Each California school district chooses a financial company as the third-party administrator (or "TPA") of its supplemental retirement programs. The result is an inconsistent and messy web of options available to teachers: "More than 50 firms are approved to be [TPAs] in California, and they can offer more than 120 different financial products to teachers....Companies may offer all of them, or only some. It varies from district to district, and there are more than 1,000 districts in California."[8]

65.     California teachers are thus inundated with 403(b) plan options—which change if a teacher changes school districts—and have had limited means to evaluate differences across annuity products.

66.     The result is that, absent disclosures like those required by the Code, commission-based agents will funnel teachers into indexed annuities from companies like LSW because those products pay among the highest commissions of any 403(b) product on the marketplace, while the teachers (1) cannot learn about all of the fees associated with those products, and (2) are not made aware of better, less expensive alternatives available to them.

67.     Recognizing that public school district employees should not be taken advantage of when planning for retirement, the California Legislature attempted to ensure that these public servants at least have access to critical, accurate, and easy-to-use information about the 403(b) products available to them. With this information, educators have the means to make better informed decisions when selecting a supplemental retirement savings plan.

### 1. The Code

68.     Recognizing that "undisclosed fees, penalties, and restrictions" were "erod[ing]

---

[8]     *See*   https://www.mercurynews.com/2022/03/12/teachers-school-employees-may-be-paying-thousands-in-extra-fees-on-retirement-accounts/ (emphasis added) (last visited Mar. 20, 2023).

[teachers'] savings" as they "struggle to budget for their retirement,"[9] the Legislature passed Cal. Educ. Code § 25100, *et seq.* (the "Code"), which mandated several key protections to ensure public school employees have the information they need and deserve when planning for retirement.

69.     First, the Code requires that prospective vendors that offer 403(b) products to California public school employees register those products with the Teachers' Retirement Board. Cal. Educ. Code § 25101. The Code established a state-sponsored "impartial investment information bank" via a website created in 2004, through which the Teachers' Retirement Board provides information on registered 403(b) products. Cal. Educ. Code § 25104(a). This website— **403bcompare.com**—contains *all* information within the investment information bank.

70.     Second, the Code requires that, on the Website, every 403(b) product vendor provides"[a] disclosure of all expenses paid directly or indirectly by retirement plan participants, including, but not limited to, penalties for early withdrawals, declining or fixed withdrawal charges, surrender or deposit charges, management fees, and annual fees…." for every product offered. Cal. Educ. Code § 25101(a)(3); *see also* Cal. Educ. Code § 25101(a) (requiring that such disclosures be included in "the impartial investment information bank established pursuant to Section 25104"). This disclosure obligation is placed entirely on vendors, including LSW. Under the Code, the Board is "not responsible for, and may not be held liable for the adequacy of the information provided by the participating vendors contained in the information bank." Cal. Educ. Code § 25109. The Code further provides that the Board maintains the information bank "only to provide information supplied by the participating vendors." *Id.* Consistent with the Code, the Board does not police 403bcompare.com. The Board has never removed a vendor based on the content or incompleteness of its submissions on 403bcompare.com and has never removed a vendor or a specific product, other than at the vendor's request.

71.     Third—and indicating just how seriously the required disclosures are to be taken—the Code provides that "[a] vendor may not charge a fee associated with a registered 403(b) product that is not disclosed, pursuant to Section 25101." Cal. Educ. Code § 25107. In other words, any fee

---

[9] California Bill Analysis, A.B. 2506 Assembly Committee, April 16, 2002.

associated with a 403(b) product that is not disclosed on 403bcompare.com is *per se* illegal.

72.     All told, the Code is designed to force 403(b) providers to be fully transparent with teachers about the fees associated with their 403(b) products so that teachers can understand the full range of expenses, whether "paid directly or indirectly," that they will be charged. Cal. Educ. Code § 25101. *See also* California Bill Analysis, A.B. 2506 Senate, Aug. 19, 2002 (explaining that the Code requires "[d]isclosure of expenses paid by retirement plan participants, types of products, product features, and services offered to participants."); *id.* ("Many teachers struggle to budget for their retirement, only to discover that undisclosed fees, penalties, and restrictions erode their savings."). The Code, and its creation of an accessible and publicly available website, is also meant to allow teachers to exchange notes and ideas related to their supplemental retirement options.

73.     Moreover, 403(b) vendors' disclosure obligations under the Code are necessarily ongoing. Cal. Educ. Code § 25102. That is, vendors must update the details about their fees on 403bcompare.com so that even after teachers purchase an annuity, they can continue to evaluate potential changes to their investment strategy. This continuing requirement is important, given that contract terms that determine an indexed annuity's earnings (*i.e.*, caps, spreads, and participation rates) change on a monthly basis. When these changes occur, teachers have the option to move their money to a new 403(b) investment, direct their future contributions to a different product, or shift their balance and/or future contributions to a different strategy within their existing annuity.

74.     Additionally, the Code's requirement that 403(b) vendors disclose their fees on an ongoing basis also protects educators against risks associated with replacing an annuity altogether. Because many agents receive hefty up-front commissions each time they sell a new product, agents are incentivized to churn teachers for commissions by switching them from one annuity to another. It is essential that teachers have the information necessary to compare their current annuity to any new annuities they might be offered.

75.     Further, the Code's disclosure requirements are critical to supporting fair competition among 403(b) providers that cater to California's public educators. By requiring that all vendors disclose all their fees, the Code creates a level playing field. Indeed, it would be manifestly *un*fair to

competition—and, of course, educators—to allow one provider to lure teachers into buying its products by hiding some or all of its fees, while other providers fully disclose theirs. The Code's comprehensive inclusion of all expenses paid by teachers is a critical mechanism for ensuring fair competition.[10]

### 2. *The Website*

76.     Once a 403(b) vendor is registered to offer 403(b) products, it is given login information for 403bcompare.com that allows it to edit general information about the vendor, add new products, and make changes to the entries associated with existing products. Every product offered by a vendor has its own page that the insurance company can quickly and directly update as information about that product changes.

77.     The information disclosed for a particular product varies based on its type: mutual fund, variable annuity, indexed annuity, and fixed annuity.

78.     For each product type, there are certain pre-defined categories of disclosures (*i.e.*, investment information and fees) and then sub-categories frequently associated with the product type. For indexed annuities, these sub-categories include things such as "Indexing and Index Crediting Methodology," "Riders," "Minimum Rate of Return," and "Caps, Spread, and Participation".

79.     The Website allows vendors to leave spaces for pre-defined categories or sub-categories associated with a given product blank, i.e. there are no "required fields" on the Website's form. If the vendor does not include information related to a particular category in its submission to the Board via the Website, the category itself does not appear on the product page.

80.     In addition to the non-mandatory pre-established fields, the Website provides vendors with ample opportunity to satisfy their statutory disclosure requirements. The Product Details tab

---

[10] *Compare* Securities & Exchange Comm'n Division of Investment Management, *Report on Mutual Fund Fees and Expenses* (Dec. 2000) at note 2 ("The Random House College Dictionary defines a fee as 'a charge or payment for services,' Random House College Dictionary 484 (Revised 1st Ed. 1982), and defines an expense as any 'cost or charge.' *Id.* at 465. We use the terms interchangeably in this report.") *with* SEC Office of Investor Education, *Investor Bulletin: How Fees & Expenses Affect Your Investment Portfolio* (June 26, 2019) ("Fees typically come in two types—transaction fees and ongoing fees. Transaction fees are charged each time you enter into a transaction, for example, when you buy a stock or mutual fund. In contrast, ongoing fees *or expenses* are charges you incur regularly.") (emphasis added).

allows providers to write an overall description of the product of up to 800 characters. The Fees and Charges tab allows vendors to create custom entries where the vendor provides the name of the fee, indicates the percentage or dollar amount, and provides a description of what the fee covers and when it is incurred. Many of the product feature sub-categories include a text box to insert as much or as little information as the vendor chooses.

81.     The Website allows participants to then compare different products to facilitate well-informed choices. The compare feature allows participants to compare specific sub-categories of information across different products. 403bcompare.com is not only for the evaluation of a potential purchase; it is also intended to benefit investors wanting to reevaluate their current product.

82.     Finally, 403bcompare.com allows vendors to designate a product as "Discontinued," meaning that it is no longer offered to new investors. The label is displayed prominently near the top of the product page, and also shown in the list of a vendor's registered 403(b) products. Therefore, vendors can also provide up-to-date information about products that are currently owned by teachers but are no longer being sold.

83.     For a product that has been marked as discontinued, but whose product information needs to be updated, the vendor can either re-activate the product, update the product information, and then once again mark the product as Discontinued, or the vendor can delete the product information page, and then re-register the same product. Using either method, the Website permits the company to use the same product name and the same product number. Defendant has itself used such a tactic: public records requests show that several of Defendant's products have two or more dates in the "CreatedDate" field, demonstrating the product was either deleted and re-entered, or deactivated and subsequently reactivated.

### D. How Defendant's Indexed Annuities Operate.

84.     With an indexed annuity, the investor's money is not actually invested in the specified market index. An indexed annuity is therefore not defined as a security, but instead as an insurance product, wherein the investor cannot lose money, and earns interest based on a complicated formula created by the insurance company, with returns *tied* in some manner to a broad-based securities index.

The returns from an indexed annuity are determined by two factors: the "*Crediting Strategy*" (*i.e.*, the index that returns are linked to, how returns are calculated, and the time period over which they are calculated), and *Fees*, including both direct and indirect fees (*i.e.*, contractual terms through which the amount of interest added to the annuity is lower than the actual growth of the underlying index).

### 1.   *Crediting Strategy*

85.     The Crediting Strategy determines the maximum potential return an investor could receive. Most indexed annuities offer several Crediting Strategies to choose from and allow investors to divide their money between multiple Strategies.

86.     The first component of a Crediting Strategy is the *index* to which returns are tied. The most common Strategy ties returns to the S&P 500, an index of large U.S. companies. Many Strategies are tied to the stock market, but that is not a requirement. For example, Defendant offers Crediting Strategies tied to the Barclays Low Volatility 5 Index, which includes only large U.S. stocks that have recently had low levels of price volatility.

87.     The second component of a Crediting Strategy is the *calculation methodology* that determines how the investor's returns will be determined in relation to the index's performance. For example, a "point-to-point" Crediting Strategy measures returns by comparing the index's value on the first and last days of the year, with the return being the amount that index has risen or fallen.

88.     The final component of a Crediting Strategy is the *time period* over which the return is calculated (and the insurance company holds the investor's money) (the "Crediting Period"). One year is standard (and the default period where the Strategy does not list the Crediting Period), though some Crediting Strategies operate over a two-year period. Interest is credited at the end of the Crediting Period. Unless the investor elects otherwise, at the end of each Crediting Period the investor's initial investment plus the credited interest rolls into a new Crediting Period.

89.     Crediting Strategies remain fixed even when money rolls from one Crediting Period to the next.

90.     The returns that investors earn from the Crediting Strategy in Defendant's indexed annuities are reduced by two types of fees: **direct** fees, which are charges that directly reduce the

investor's account balance, and **indirect** fees, which are earnings generated by the investor's money that the vendor retains, or the contractual terms that produce that result. *See* California State Teachers' Retirement System, *403(b) & 457(b) Fundamentals Topics*, at https://www.403bcompare.com/Fundamentals403bAnd457b#ProductFees (identifying types of "Product Fees" and explaining that "[s]ome products claim to have no fees. Be wary of these products. They typically are products that have a low fixed rate of return. The return is low because they are taking the fees out of your returns. Hence, they are 'baked into the product' itself.") (last visited Mar. 20, 2023).

### 2. Direct Fees

91.     **Riders.** When an investor signs up for an indexed annuity, they can choose to purchase a "rider," which provides additional features in the contract. Riders may provide additional flexibility regarding when money can be withdrawn without penalty (*e.g.*, disability or nursing home confinement), how money is credited (*e.g.*, provides a boost to the Crediting Strategies or limits the fees), or how much money can be withdrawn (*e.g.*, allowing guaranteed minimum withdrawal amounts where certain criteria are met). Most riders come with a direct fee that is deducted from the contract value.

### 3. Indirect Fees

92.     The returns generated by a particular Crediting Strategy are also subject to indirect fees.[11] Indirect fees are imposed by the insurance company at the beginning of the Crediting Period and are locked in for the duration of that Period.

93.     Unlike Crediting Strategies, however, indirect fees are subject to change from Crediting Period to Crediting Period, without consent or advanced notice.

94.     Defendant LSW sets the indirect fees for each of its products at a level that will (1)

---

[11] Defendant LSW uses the phrase "levels and limits on contract participation in any future increases in the underlying indexes" to refer to what Plaintiffs have defined herein as "indirect fees." *See* NVL Financial Corporation and Subsidiaries 2022 Annual Report, at 19, available at https://www.nationallife.com/-/media/Documents/national-life/public/National_Life_Document/Performance_and_Prospectus/finstmts123122.ashx (last visited Mar. 20, 2023).

generate enough money to cover LSW's expenses, (2) generate LSW's desired level of profits, and (3) allow LSW to purchase derivative securities that will pay all interest potentially due to investors without any risk of losses to LSW if markets decline, while also allocating a share of the income from those derivatives to LSW when markets rise. To accomplish these ends, LSW's indexed annuities contain several key indirect fees.

95.    **Caps.** A cap is an upper limit on how much of the Crediting Strategy's returns can be credited to an investor's account. For example, for the annual period beginning in November 2020, Plaintiff Oxx had $31,855.73 invested in a S&P 500 point-to-point one-year Crediting Strategy. The index gained over 42% by the end of the annual Crediting Period. However, LSW imposed a 3% cap, so Oxx was credited with $963.19 (a 2% gain) rather than $13,674.94 (a 42% gain). Similarly, for the annual period beginning in November 2018, Plaintiff Fallas was capped at 2% interest despite the S&P 500 going up over 12%. As a consequence, Fallas earned only $36.62, rather than the $225.58 she would have earned were it not for the cap imposed by LSW. So too for Plaintiff Blisten. For the annual period beginning in October 2021, he had $23,879.56 invested in a S&P 500 monthly Crediting Strategy. But Defendant imposed a 1.9% cap on the index's returns each month, depriving Blisten of substantial gains over those 12 months.

96.    **Participation rates.** Participation rates are the percentage of an index's returns that are credited to an annuity. Where a participation rate is imposed, the investor is only credited with the portion of the Crediting Strategy's return equal to the participation rate. For example, if the Crediting Strategy gains 10% but the participation rate is 30%, the investor's return is 3%. A "participation rate" is functionally a floating cap, expressed as a percentage of market returns. For example, for the annual period beginning in November 2020, Plaintiff White invested in a S&P 500 point-to-point one-year Crediting Strategy in 2019, but due to the 60% participation rate that LSW imposed, White received interest of only 17% rather than the index's actual return of 28%.

97.    **Spread fees.** The spread fee (commonly referred to as an asset fee, margin fee, or administrative fee) is a percentage amount that is subtracted from any gain generated by the Crediting Strategy. For example, Plaintiff Hoffman's interest for 2021 was reduced by the 6.95% spread fee

LSW imposed on his Barclays Low Vol 5 point-to-point one-year Crediting Strategy.

98.     Caps, participation rates, and spread fees are indirect fees paid by investors. As the Securities and Exchange Commission ("SEC") has explained, "Indexed annuities typically use one or more features that restrict the positive return that is applied to your annuity contract value . . . [Participation rates, rate caps, and spread fees] can reduce your return in the same way that a direct fee would even if the annuity is called a 'no fee' annuity."[12]

99.     The National Association of Insurance Commissioners ("NAIC") also refers to the aforementioned items as "fees." "Participation rates, cap rates, and spread rates (sometimes called margin or asset fees) are all terms that describe ways the amount of interest added to your annuity may not reflect the full change in the index." *See* NAIC, Buyer's Guide for Fixed Deferred Annuities, 2013, at 4 (available at https://content.naic.org/sites/default/files/publication-anb-lp-consumer-annuities-fixed.pdf).

100.    The fees paid directly and indirectly by investors add up to Defendant LSW charging some of the highest fees within any 403(b) product offered in California. Between 2019 and 2022, LSW collected $1.6 billion from investors in indexed annuities on roughly $12 billion of account balances held in these products in the United States.

101.    This translates to costs of approximately **3.4% per year** within the indexed annuity 403(b) products that LSW offers California public school employees. This is nearly double the 1.78% charged by the average 403(b) product in California,[13] and more than three times the median cost of 1.04% within the 6,000 403(b) investment options surveyed by the U.S. Government Accountability Office ("GAO") in its 2022 report.[14] And these averages likely overstate the fees paid by the average

---

[12] Securities and Exchange Commission Office of Investor Education and Advocacy, *Updated Investor Bulletin: Indexed Annuities*, July 31, 2020, available at https://www.sec.gov/oiea/investor-alerts-and-bulletins/ib_indexedannuities. The SEC is an important entity under the Code, as Cal. Educ. Code § 25106 provides that the board should look to the SEC, the Internal Revenue Services ("IRS"), and the National Association of Insurance Commissioners ("NAIC") as sources for the "[d]efinitions or explanations of all fees referred to in the investment information bank."

[13] *See* https://403bwise.org/education/403b-fact-sheet (last visited Mar. 20, 2023).

[14] *See* United States Government Accountability Office, *Defined Contribution Plans: 403(b) Investment Options, Fees, and Other Characteristics Varied* (2022) at 34 (hereinafter "GAO 403(b) Report") (showing median investment expense of .90% of over 6,000 investment options surveyed

403(b) investor.[15] As advocates for 403(b) reform explain, over a 35-year career of investing $250 per month, a 3% fee (0.40% *lower* than what Defendant collects on average) in a 403(b) investment product will **cut a teacher's retirement savings <u>almost in half</u>** compared to a low-cost 403(b) investment option.[16]  *See infra* Chart at ¶ 13.

## **DEFENDANT'S ROUTINE FAILURE TO DISCLOSE FEES**

### **A. Defendant LSW Routinely Violates the Code by Charging Fees Associated with Its 403(b) Indexed Annuity Products that Defendant Fails to Disclose.**

102.  Indexed annuities make up over 90% of Defendant LSW's annuity sales.[17]

103.  Indeed, Defendant is one of the two largest providers of indexed annuities to California public school teachers and one of the largest 403(b) vendors in California.

104.  For a time, Defendant complied with the Code by posting its products' fees to 403bcompare.com. For the products that Plaintiffs Hoffman, Fallas, Oxx, Stokes, White, De Altonaga, Krimbow, Lui, and Gallagher invested in, Defendant posted at least some fees to 403bcompare.com.

105.  Then, Defendant stopped. Knowing full well about its obligations under the Code and

---

that cost between 0.02% and 3.74%), 46 (showing median administrative fees of 0.1425% for the smallest plans in the sample), *available at* https://www.gao.gov/assets/gao-22-104439.pdf.

[15] The averages stated herein and *supra* in notes 13 and 14 are simple averages that assume the same amount of money is invested in every 403(b) product offered in California, with money spread evenly between every investment option available within that product. This is a flawed assumption, however, because products and investment options with more assets have greater economies of scale, and thus tend to charge lower fees (especially in a well-functioning marketplace with pricing transparency). As the Investment Company Institute—the mutual fund industry's trade organization—has explained, "asset-weighted averages . . . [of] the expenses and fees that shareholders pay through funds . . . are preferable to simple averages, which would overstate the expenses and fees of funds in which investors hold few dollars." Investment Company Institute, 2022 INVESTMENT COMPANY FACT BOOK, at 99, https://www.ici.org/doc-server/pdf%3A2022_factbook.pdf. So while the average expense ratio for equity mutual funds was 1.13 percent in 2021, "[t]he asset-weighted average expense ratio for equity mutual funds (the average shareholders *actually* paid) was far lower, at 0.47 percent." *Id.* at 102 (emphasis added). This suggests that the average 403(b) investor in California is paying far less than the 1.78% average among the products on 403bcompare.

[16] *See* https://403bwise.org/education/bad-403b (last visited Mar. 20, 2023).

[17]*See*                                    https://www.nationallife.com/-/media/Documents/national-life/public/National_Life_Document/Performance_and_Prospectus/2021_Q4_STAT_LSW.ashx (last visited Apr. 18, 2023).

how to comply via 403bcompare.com, Defendant simply abandoned its duty of disclosure. Accordingly, fees remain posted to 403bcompare.com for Defendant's products. But the fees are years out of date, and thus misleading about the actual, current fees Defendant is charging. In particular, Defendant has not updated any product information on the Website regarding the SecurePlus Platinum product since December 15, 2015. Defendant has not updated the SecurePlus Paramount 5 product information on the Website since July 27, 2016. Defendant has not updated the SecurePlus Elite product information on the Website since December 15, 2015. Finally, Defendant has not updated the FIT Rewards Growth product information on the website since June 25, 2020. This is despite the fact that the participation rates, caps, and spread fees imposed by Defendant on each of these products have changed several times per year in every year since 2015.

106.     Accordingly, despite the clear purpose and language of the Code, public school employees routinely incur fees within Defendant LSW's products that are not disclosed on 403bcompare.com.

107.     Not only does Defendant collect undisclosed and unauthorized fees in violation of the Code, but it also engages in unfair competition, including unlawful and unfair business acts or practices, in violation of the UCL. By listing inaccurate, outdated fees on 403bcompare.com, Defendant misleads investors about the amount of fees LSW will extract from their retirement savings. Defendant's false disclosures encompass caps, participation rates, and spread fees.

108.     For example, Defendant's outdated fee disclosures mean it has posted falsely high caps to 403bcompare.com. As a result, Defendant misled participants about the ceiling on their products' returns. For example, on the "SecurePlus Platinum" product page, under "CAPS, SPREAD, AND PARTICIPATION," Defendant states "The minimum cap is 3.00%".[18]

CAPS, SPREAD, AND PARTICIPATION

Caps for this product

The cap is the maximum interest rate that may be applied to an Index Account. The cap is reset annually on the Index anniversary of each premium and is guaranteed for at least 12 months. The minimum cap is 3.00%.

109.     The "minimum cap" means the maximum fee Defendant could charge. In other words,

---

[18] *See* https://www.403bcompare.com/products/45 (last visited Mar. 20, 2023).

Defendant tells participants that if their Crediting Strategy produces interest over 3%, the participant will be credited with at least 3% interest. This is false. Plaintiff Stokes's account statement for fourth quarter 2021 shows that Defendant actually capped interest for this product at 1.75%. Defendant not only falsely represented the minimum cap on this product; Defendant also failed to disclose the product's actual, current cap at all. For example, the SEC requires mutual fund companies to disclose both the fund's current fee *and* its maximum account fee. *See* Tailored Shareholder Reports for Mutual Funds and Exchange-Traded Funds; Fee Information in Investment Company Advertisements, 87 FR 72758-01 (requiring disclosure of both current fee and "maximum account fee"). In fact, Defendant's statement on 403bcompare.com that "[t]he minimum cap is 3.00%" is not even a fee disclosure. This statement merely sets out the lowest cap (i.e., highest fee) Defendant could charge; it does not disclose the actual fee, as the Code demands.

110.    The Website also failed to disclose the cap imposed on Plaintiff White's SecurePlus Platinum product. Though the Website did not disclose the actual cap throughout 2019 and 2020, stating only that the minimum cap was 3%, Defendant was in fact imposing a lower cap, meaning higher fees. In November and December 2019, a 2.5% cap was imposed on her account. In December 2020 and January 2021, Defendant imposed a 1.5% cap on her account, despite Website language stating that the "minimum" cap on her product was 3%. Similarly, Defendant imposed a 2% cap on Plaintiff Krimbow's SecurePlus Platinum product for the period beginning January 2021, despite the Website stating at that time that the minimum cap was 3%. That same 2% cap was imposed on Plaintiff Lui for the annual period beginning January 2020, despite the Website stating that the minimum cap on the SecurePlus Platinum product Lui was invested in was 3%.

111.    This same statement about the "minimum cap" is contained on the "SecurePlus Elite" product page, under "CAPS, SPREAD, AND PARTICIPATION."[19] For the past four years, Defendant has not disclosed on the Website the actual cap imposed on Plaintiff Oxx's SecurePlus Elite product. Though Defendant did not disclose it on 403bcompare.com, Defendant imposed a 3% cap on Oxx's account in October, November, and December of 2020, maximizing LSW's fee. Nor

---

[19] *See* https://www.403bcompare.com/products/165 (last visited Mar. 20, 2023).

could Plaintiff Fallas and Plaintiff De Altonaga have known that Defendant's SecurePlus Paramount 5 product capped interest at 1.25% in April 2020, given that Defendant's only disclosure on 403bcompare.com was that "The minimum cap is 1.00%."[20]

112.   Defendant also posted falsely high participation rates for its products on 403bcompare. For example, on the "FIT Rewards Growth" product page, under "CAPS, SPREAD, AND PARTICIPATION," Defendant states that the current participation rate is 100%.[21] In other words, Defendant tells participants that they will be credited with the same performance as the underlying index. This is false. Plaintiff Hoffman's account statement for September 2021 shows that Defendant actually imposed a participation rate of 20% for its BAML Participation point-to-point one-year Crediting Strategy. For the one-year periods beginning in July and September of 2020, Defendant imposed a 50% participation rate on this strategy, while the Website stated the current participation rate was 100%. Disclosures related to the SecurePlus Platinum product were similarly misleading. Since 2016, Defendant has falsely disclosed on the Website that the current participation rate for its SecurePlus Platinum product is 100%, and that the "Guaranteed Minimum Participation Rate" was 30%.[22] In reality, Plaintiff White's S&P 500 averaging one-year Crediting Strategy was subject to a 60% participation rate as of the fourth quarter 2018. Defendant imposed a far more severe 15% participation rate on monies invested in the one-year period beginning January 2021, cutting White's returns *in half* compared to the *minimum* participation rate disclosed on the Website, while her returns for that period were *seven times less* than what White would have received if her current participation rate had in fact been 100%, as stated on the Website. Similarly, Defendant falsely disclosed the participation rate for its SecurePlus Paramount 5 as 100% on 403bcompare.com.[23] But Defendant actually pocketed half of the returns from Plaintiff De Altonaga's S&P 500 averaging one-year Credit Strategy due to a 50% participation rate as of fourth quarter of 2022.

113.   Finally, Defendant misled teachers by posting incorrect spread fees to 403bcompare.com. On 403bcompare.com, Defendant stated that its FIT Rewards Growth product

---

[20] *See* https://www.403bcompare.com/products/185 (last visited Mar. 20, 2023).
[21] *See* https://www.403bcompare.com/products/262 (last visited Mar. 20, 2023).
[22] *See* https://www.403bcompare.com/products/45 (last visited Mar. 20, 2023).
[23] *See* https://www.403bcompare.com/products/185 (last visited Mar. 20, 2023).

was subject to a spread fee of 1.5%,[24] meaning the underlying index must perform higher than that for the annuity-holder to receive any interest. But the actual fee imposed by Defendant on its Barclays Low Vol 5 point-to-point one-year Crediting Strategy was 6.95% for the one-year period starting October 2021, more than four times higher than the fee Defendant disclosed. Plaintiff Hoffman paid this higher, undisclosed spread fee. For the one-year period beginning in July and September of 2020, Defendant imposed a 3% spread fee on Hoffman's account, double the "Current Spread" of 1.5% disclosed on the Website at that time.

114.   Defendant's failure to disclose the terms of its caps, spread fees, and participation rates is unusual. Across 403bcompare.com, other 403(b) vendors provide the accurate disclosures required by the Code.

115.   For example, one product page from another vendor provides a detailed description of the product's cap (currently set at 2.9% and guaranteed to never go below 2%), as well as the current participation rate (100%).[25]

116.   Another vendor provides similarly detailed information about its caps and participation rates.[26]



CAPS, SPREAD, AND PARTICIPATION

Caps for this product

Annual Point to Point Index Account Cap-3.50% Monthly Sum Index Account Cap-1.85% Annual Average Index Account Cap-3.75% Fixed Account Current Interest Rate-1.85%

Current Participation Rate

100.00%

---

[24] *See* https://www.403bcompare.com/products/262 (last visited Mar. 20, 2023).
[25] *See* https://www.403bcompare.com/products/158 (last visited Mar. 20, 2023).
[26] *See* https://www.403bcompare.com/products/197 (last visited Mar. 20, 2023).

117.    The actual rates used for caps, spreads, and participation rates are what matter to investors, and what enables them to compare different vendors and products, as these terms have huge impacts on account values. For example, had Defendant fulfilled its requirements under the Code, Plaintiff Stokes and Plaintiff White could have compared the fees imposed by SecurePlus Platinum against those imposed by two of its competitors:

118.    Plaintiffs Hoffman, Fallas, Oxx, Stokes, White, De Altonaga, Krimbow, Lui, and Gallagher were each in LSW products purchased after passage of the Code, and made 403(b) contributions to those products via payroll deduction through their school district. Yet for the products they invested in (FIT Rewards Growth, SecurePlus Paramount 5, SecurePlus Elite, and SecurePlus Platinum), LSW either disclosed false fees or failed to disclose some or all fees at all. These fees,



which were incurred by Hoffman, Fallas, Oxx, Stokes, White, De Altonaga, Krimbow, Lui, and Gallagher over the past four years, were not disclosed on 403bcompare.com.

119.    Having failed to disclose these fees, Defendant was not authorized to charge them. *See* Cal. Educ. Code § 25107.

**B.  Defendant Provided No Disclosures About the Products in Which Plaintiff Blisten and Plaintiff Strozewski Were Invested.**

120.    Plaintiff Blisten invested in Defendant's "FIT Income Plus" indexed annuity product, dividing his assets between two S&P 500 Crediting Strategies: one annual and one monthly. Plaintiff

-25-

Strozewski invested in the "SecurePlus Silver" indexed annuity product offered by Defendant, dividing her assets between a S&P 500 point-to-point Crediting Strategy and a S&P 500 averaging Crediting Strategy.

121.    There is no mention of FIT Income Plus or SecurePlus Silver on 403bcompare.com. Defendant has failed to disclose not only these products' fees, but their existence. Despite selling these products to California public school employees in 403(b) accounts after passage of the Code, Defendant never registered either product on 403bcompare.com.

122.    Both products were subject to heavy fees. As for FIT Income Plus, Defendant capped interest on Plaintiff Blisten's annual S&P 500 Crediting Strategy at 3.85% and capped interest on his monthly S&P 500 Crediting Strategy at 1.9%.

123.    Plaintiff Blisten also paid a rider fee in connection with FIT Income Plus. A rider, as noted above, is a feature that an investor can elect to add to his annuity, which may have an additional cost. For example, some riders enhance the amount of the annuity's benefits in the event that the annuity holder dies during the annuity's term.

124.    Riders are "expenses paid directly…by retirement plan participants" and therefore must be disclosed, or otherwise cannot be charged, by Defendant. *See* Cal. Educ. Code §§ 25101(a)(3), 25107.

125.    Other vendors provide detailed information about the fees for their products' riders. For example, one vendor identifies the type of rider offered, when it is charged, and the amount of its fee.[27]

---

[27] *See* https://www.403bcompare.com/products/183#/fees (last visited Apr. 7, 2023).

| Fees | | | | | | |
|---|---|---|---|---|---|---|
| Fee | Amount/ Percentage | When Applied | How Computed | Fee Waiver | Breakpoint | Capped |
| Administrative Fee | 0.15% | Annually | Percentage of Annual Assets | Yes | Yes | No |
| View Fee Details | | | | | | |
| Contract Fee | $50.00 | Annually | Flat Dollar Amount | Yes | Yes | No |
| View Fee Details | | | | | | |
| | | Annually | Percentage of Annual Assets | Yes | Yes | No |
| View Fee Details | | | | | | |
| Optional Rider Fee - Liquidity Option | 0.25% | Annually | Percentage of Annual Assets | Yes | No | No |
| View Fee Details | | | | | | |

**Optional Rider Fee**

A fee associated with an amendment to an insurance policy that has the effect of either expanding or restricting the policy's benefits.

126.     When Plaintiff Blisten initially selected his rider and each year thereafter, Defendant failed to disclose on 403bcompare.com (1) that this rider was offered with this product and (2) the rate charged for the rider, or that any fees would be charged at all.

127.     Plaintiff Krimbow was also charged rider fees that were not disclosed on the Website. Between September 2019 (when Krimbow first invested in the SecurePlus Platinum product) and 2023, the Website has stated that the SecurePlus Platinum product offered an optional Guaranteed Lifetime Income Rider, and that investors who selected the rider would pay annual fees of between 0.65% and 0.75% of their account balance. Krimbow selected this rider when opening her account, but was charged an annual rate of 0.90% for the rider over the next four years, 20% higher than the maximum rate disclosed on the Website.

128.     The unregistered product in which Plaintiff Strozewski invested—SecurePlus Silver—is also laden with undisclosed fees. Defendant capped Plaintiff Strozewski's interest on the S&P 500 point-to-point Crediting Strategy at 5%, taking all returns above that amount for itself. And Defendant pocketed half of the S&P 500 averaging Crediting Strategy's returns by imposing a 50% participation rate.

129.     Having failed to disclose any fees for FIT Income Plus and SecurePlus Silver,

-27-

Defendant was not authorized to charge them. *See* Cal. Educ. Code § 25107.

## **THE CODE PROTECTS ALL TEACHERS BY PROTECTING THE MARKET**

130.   The Code protects teachers by requiring transparency in the market. It prevents vendors from charging fees unless they are properly disclosed.

131.   Transparency encourages price competition. It drives down prices—in this case, fees—by forcing vendors to compete for business. Vendors charge the same fees for a given product at a given time to all purchasers. When transparency forces vendors to lower their fees to attract savvy investors, less sophisticated investors benefit as well. The Code benefits not only the teachers who compare fees between vendors, but also other teachers who pay lower fees without necessarily realizing they are enjoying the fruits of competition.

132.   As the Supreme Court has explained, legislators intend retirement plan disclosure requirements to benefit not only the employees who read them, but also their co-workers, who learn the information through "fellow employees [] or informal workspace discussion." *CIGNA Corp. v. Amara*, 563 U.S. 421, 444 (2011). Indeed, the information contained on the Website has become an important tool in the 403(b) marketplace. The GAO relied on Website data in forming its 2022 report to Congress on 403(b) plans,[28] and educators around the country rely on the Website for data on investment products and their associated fees.[29] As of May 31, 2023, the Website has had 2,321,395 visitors over the past four years, averaging 1,429 visitors per day.

133.   The effect of the Code's transparency requirement thus has widespread effects. So does its enforcement mechanism: the ban on undisclosed fees. All investors are entitled to recover hidden fees that vendors impose. The Code thereby protects all purchasers, whether a vendor complies with the transparency requirement and as a result is pressured to lower its fees or the vendor violates the transparency requirement and must disgorge the unlawful fees it charges.

---

[28] GAO 403(b) Report at 34 (measuring median investment expense using data from the Website).
[29] Dan Otter, 403BWISE.COM, *How to Use 403bcompare.com*, Dec. 1, 2020 ("A [403bwise Facebook Group] post . . . reminded me of another amazing tool: 403bcompare.com. This is a database of 403(b) fee and vendor information for products offered to California public school districts and community colleges. . . . [T]he beauty of the resource is that it can be used by virtually anyone in any state."), available at https://403bwise.org/blog/entry/blog-403bcompare-praise.

## CLASS ACTION ALLEGATIONS

134.    Plaintiffs bring their claims on behalf of themselves individually, and the following Class pursuant to Fed. R. Civ. P. 23:

> All public employees of all California local school districts, community college districts, county offices of education, and state employees of a state employer under the uniform state payroll system, excluding the California State University System, eligible to participate in an annuity contract and custodial account as described in Section 403(b) of the Internal Revenue Code of 1986 who, in the four years predating the filing of this Complaint and continuing through the date the class list is prepared, were invested in an indexed annuity 403(b) product issued by Defendant and who paid fees that were not disclosed on 403bcompare.com.

135.    <u>Numerosity</u>: The Class is so numerous that joinder of all class members is impracticable. Given the volume of Defendant's business, there are hundreds or thousands of class members.

136.    <u>Commonality</u>: This case presents common questions of law and fact, including but not limited to:

a)      Whether Defendant violated the Code;

b)      Whether Defendant's conduct was unlawful and unfair under the UCL;

c)      The proper scope of injunctive relief; and

d)      The proper measure of restitution.

137.    <u>Typicality</u>: Plaintiffs' claims are typical of the members of the Class.  The UCL violations suffered by Plaintiffs are typical of those suffered by other class members, and Defendant treated Plaintiffs consistently with other class members in accordance with its standard policies and practices.

138.    <u>Adequacy</u>: Plaintiffs will fairly and adequately protect the interests of the Class because they and their experienced counsel are free of any conflicts of interest and are prepared to vigorously litigate this action on behalf of the Class.

139.    <u>Predominance</u>: Class certification is appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class, and because a class action is superior to other available

methods for the fair and efficient adjudication of this litigation. Defendant's conduct described in this Complaint stems from common and uniform policies and practices, resulting in common violations of the UCL. Members of the Class do not have an interest in pursuing separate actions against Defendant, as the amount of each class member's individual claim is small compared to the expense and burden of individual prosecution. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendant's practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all class members' claims in a single forum.

140.    In view of the complexities of the issues and the expenses of litigation, the separate claims of individual class members are insufficient in amount to support separate actions.

141.    Yet, the amount which may be recovered by individual class members will be large enough in relation to the expense and effort of administering the action to justify a class action. The administration of this action can be handled by class counsel or a third-party administrator, and the costs of administration will represent only a small fraction of the ultimate recovery to be achieved.

**CLAIM FOR RELIEF**
CAL. BUS. & PROF. CODE § 17200
**On behalf of Plaintiffs Individually and the Class**

142.    Plaintiffs reiterate each of the allegations in the preceding paragraphs as if set forth at length herein.

143.    Plaintiffs and class members are "persons" within the meaning of Section 17201 of the UCL.

144.    Plaintiffs lack an adequate remedy to obtain relief for the violations of law and harms alleged above.

145.    The UCL defines "unfair competition" to include any unlawful, unfair, or fraudulent business act or practice, and prohibits such acts or practices. Cal. Bus. & Prof. Code § 17200.

146.    Because the UCL is written in the disjunctive, a business act or practice need only meet one of the three criteria—unlawful, unfair, or fraudulent—to be considered unfair competition.

147.     Defendant has engaged and continues to engage in unfair competition within the meaning of the UCL because Defendant's conduct alleged herein is both unlawful and unfair.

148.     Defendant's conduct, as described herein, violates the UCL's "unlawful" prong.

149.     Defendant is a "vendor" within the meaning of Cal. Educ. Code § 25100(c)(2).

150.     As such, Defendant is required to make a "disclosure of all expenses paid directly or indirectly by retirement plan participants, including, but not limited to, penalties for early withdrawals, declining or fixed withdrawal charges, surrender or deposit charges, management fees, and annual fees," which "shall be included in the impartial investment information bank established pursuant to Section 25104" (*i.e.*, 403compare.com), and is prohibited from charging any fees associated with its 403(b) products that are not so disclosed. Cal. Educ. Code § 25107; Cal. Educ. Code § 25101.

151.     However, in clear violation of the Code, Defendant routinely charges fees on its 403(b) products which are not disclosed on 403bcompare.com.

152.     Defendant's violations of the Code serve as predicate unlawful actions under the UCL.

153.     Separately, Defendant's conduct, as described herein, also violates the UCL's "unfair" prong as Defendant's conduct is unfair to consumers, using any of the three standards used by California courts in UCL consumer actions.

154.     First, Defendant's practices of charging undisclosed and hefty fees on its 403(b) products are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, and have caused harm to Plaintiffs and class members. The harm caused by these business practices— *i.e.*, skimming tens of millions of dollars from the retirement savings of unsuspecting public servants—vastly outweighs any legitimate utility they possibly could have.

155.     Second, the undisclosed fees within its 403(b) products (1) have caused, and continue to cause, substantial injury to Plaintiffs and class members; (2) the injury is not outweighed by any countervailing benefits to consumers or competition; and (3) the injury could not reasonably have been avoided by Plaintiffs and class members.

156.     Third, Defendant's conduct is also unfair as it significantly threatens or harms

competition. By failing to disclose expenses, Defendant has made it appear as though its 403(b) products cost less than those offered by Defendant's competitors, who comply with the Code and disclose the full range of fees investors will pay within their 403(b) products. By misstating and hiding many of its fees, Defendant has managed to lure California public school teachers to invest in its products (which are, in many cases, objectively worse than other products available) and to emerge as a leading annuity provider to the state's educators. Defendant then traps these unknowing investors in its products by assessing surrender charges of up to 12% depending on when the investor tries to get out of the investment. The Legislature's declared policy in the Code is that *all* 403(b) vendors must disclose *all* their fees. Given the Legislature's clear directive—which protects both educators and other vendors—Defendant's conduct violates the policy and spirit of the Code and is therefore unfair. Defendant's conduct provides Defendant an unfair advantage over its competitors, which comply with applicable disclosure requirements under the Code.

157.    As a result of Defendant's unlawful and unfair practices, Plaintiffs and class members have suffered injury in fact because they paid undisclosed and unauthorized fees on the 403(b) products that they purchased from Defendant.

158.    Because many of the Plaintiffs and putative class members still have a 403(b) product with Defendant, and because of the ubiquity of Defendant's unlawful and unfair business practices, there is a real and immediate threat that Plaintiffs will suffer the same injury—being charged unauthorized fees—in the future.

159.    Plaintiffs and the Class are entitled to, and do seek, equitable restitution and the recovery of attorneys' fees and costs.

160.    Plaintiffs and the Class are also entitled to, and do seek, an injunction prohibiting Defendant from continuing its unlawful and unfair conduct and for an order requiring Defendant to make full disclosures on 403bcompare.com of the fees associated with its registered 403(b) products.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, seek the following relief:

a.    Determining that this action may proceed as a class action under Fed. R. Civ. P.

1  23;

2  b.  Designating Plaintiffs as the class representatives for the Class;

3  c.  Designating Plaintiffs' Counsel as counsel for the Class;

4  d.  Issuing proper notice to the Class at Defendant's expense;

5  e.  Declaring that Defendant committed multiple violations of the UCL;

6  f.  Granting appropriate restitution;

7  g.  Granting appropriate injunctive relief;

8  h.  For an order awarding attorneys' fees, expenses, and recoverable costs reasonably
9  incurred in connection with the commencement and prosecution of this action
10  including but not limited to attorneys' fees and expenses under the substantial
11  benefit and/or common fund doctrine or other similar principle or doctrine, or in
12  accordance with Cal. Code of Civ. Proc. §§ 1021.5; and

13  i.  Granting other and further relief, in law or equity, as this Court may deem
14  appropriate and just.

15  **<u>JURY DEMAND</u>**

16  Plaintiffs, on behalf of themselves and the Class, demand a trial by jury on all issues triable
17  by a jury.

18

19

20  ENGSTROM LEE LLC

21  Dated: October 2, 2023  /s/Carl F. Engstrom

22  Carl F. Engstrom, *pro hac vice*
   *Counsel for All Plaintiffs*

23

24

25

26

27

28